No. 23-1550 & 23-1684

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

STEVEN A. CONNER, DPM, P.C., individually and on behalf of all others
similarly situated,

*Appellant-Plaintiff/Cross-Appellant*,

v.

FOX REHABILITATION SERVICES, P.C.,

*Appellee-Defendant/Cross Appellant.*

_____

Appeal from the United States District Court for the
Eastern District of Pennsylvania, Case No. 21-CV-1580
Hon. Michael M. Baylson, Senior District Court Judge

_____

**APPELLEE/CROSS-APPELLANT'S PRINCIPAL AND RESPONSE BRIEF**

_____

Ryan D. Watstein
Alexander D. Terepka (*admission* forthcoming)
Abigail L. Howd (*admission* forthcoming)
WATSTEIN TEREPKA LLP
1055 Howell Mill Road, 8th Floor
Atlanta, Georgia 30318
Phone: (404) 418-8307
ryan@wtlaw.com
alex@wtlaw.com
ahowd@wtlaw.com

*Counsel for Appellee-Defendant/Cross-Appellant Fox Rehabilitation Services,
P.C.*

# United States Court of Appeals for the Third Circuit

## <u>Corporate Disclosure Statement and<br>Statement of Financial Interest</u>

No. <u>   23-1550 & 23-1684   </u>

### STEVEN A. CONNER, DPM, P.C., individually and on behalf of all others similarly situated,

v.

### FOX REHABILITATION SERVICES, P.C.,

<u>Instructions</u>

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, makes the following disclosure:

Fox Rehabilitation Services, P.C.
_____
(Name of Party)

1) For non-governmental corporate parties please list all parent corporations: None

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

None

3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

None

4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A

/s/ Ryan D. Watstein
_____
(Signature of Counsel or Party)

Dated: 10/03/2023
_____

# TABLE OF CONTENTS

DEFENDANT-APPELLEE'S PRINCIPAL AND RESPONSE BRIEF ................. 1

JURISDICTIONAL STATEMENT .......................................................... 1

STATEMENT OF THE ISSUES ............................................................ 2

STATEMENT OF RELATED CASES .................................................... 4

STATEMENT OF THE CASE/FACTUAL BACKGROUND ............................ 5

I.    Relevant Facts. ............................................................................ 5

      A.    Fox's Business and Interactions with Referring Physician Practices...5

      B.    The COVID-19 Pandemic Creates an Emergency for Fox and Its
            Patients. ............................................................................. 7

      C.    Fox Sends Faxes to Referring Physicians to Inform Them About Fox's
            Pandemic-Related Operations and Safety Measures. ........................ 8

      D.    Openfax's Transmission Logs Are Unreliable, as the CEO of Openfax
            Confirmed. ........................................................................ 10

      E.    Physicians that Received the Faxes Found Them Timely and Medically
            Helpful. ............................................................................ 11

II.   Procedural History. ..................................................................... 14

      A.    Conner Filed this TCPA Class Action and Had Ten Months of
            Discovery Before Moving for Class Certification. ........................... 14

      B.    Conner Moved for Class Certification over a Year into the Case Which
            the District Court Denied and this Court Declined to Review. .......... 17

      C.    The District Court Denied the Parties' Cross Motions for Summary
            Judgment. .......................................................................... 18

      D.    The Evidence at Trial Further Confirmed No Class Could Be Certified
            and that the Notices Were Not Advertisements. ............................ 19

SUMMARY OF ARGUMENT ............................................................ 22

ARGUMENT .......................................................................................28

I.    Standard of Review for the Issues on Appeal. .............................28

      A.    Legal Standard Applicable to Certification: Conner Bears a Heavy
            Burden to Prove Each Element of Rule 23. .......................................29

      B.    The District Court Did Not Abuse Its Discretion in Holding that Conner
            Failed to Prove Predominance. ..........................................................30

            1.    Individualized Issues of Consent Precluded Predominance. 30

            2.    Individualized Questions About Virtual Faxes Precluded
                  Predominance. ......................................................................38

            3.    Individual Questions About Article III Standing Precluded
                  Predominance. ......................................................................40

      C.    The District Court Did Not Abuse Its Discretion in Finding that the
            Proposed Class Is Not Ascertainable. .................................................41

      D.    The District Court Did Not Abuse Its Discretion in Refusing to Compel
            Irrelevant Salesforce Records that Conner Did Not Request. ............45

      E.    The District Court Did Not Abuse Its Discretion in Refusing to Compel
            Discovery Requests that Conner Waived. ...........................................50

II.   Fox's Informational Faxes Were Not Advertisements, and Applying the
      TCPA to Punish Fox for Sending Them Would Violate the First Amendment.
      ..............................................................................................................51

      A.    The TCPA Prohibits "Unsolicited Advertisements." .........................51

      B.    The District Court Erred in Holding that the Faxes Were
            Advertisements. ...................................................................................52

            1.    The District Court Applied an Incorrect Legal Standard. .....52

            2.    By Refusing to Consider Evidence of Context, the District
                  Court Erroneously Found the Faxes to Be Advertisements. .55

      C.    The TCPA's Commercial Fax Ban Violates the First Amendment. ..58

      D.    The Fax Ban Fails Strict Scrutiny. .....................................................61

1.      The Fax Ban Does Not Further a Compelling Interest. ........62

2.      The Fax Ban Is Not Narrowly Tailored. ...............................62

E.    Even if Intermediate Scrutiny Applies, the Fax Ban Would Not Pass
       Constitutional Muster. .......................................................................64

CONCLUSION .................................................................................................66

# TABLE OF AUTHORITIES

**Cases**

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996)....................................69

*Amerifactors Fin. Grp.*, 2019 WL 6712128 (Dec. 9, 2019).............................42, 44

*Ariz. Free Enter. v. Bennett*, 564 U.S. 721 (2011) ..................................................70

*Armann v. McKean,* 549 F.3d 279 (3d Cir. 2008)...................................................29

*Barr v. Am. Assoc. of Pol. Cons., Inc.*, 140 S. Ct. 2335 (2020) ............67, 68, 69, 75

*Becker v. Bank of N.Y. Mellon Tr. Co., N.A.*, 2012 WL 13018242 (E.D. Pa. Dec. 18, 2012) ....................................................................................................................38

*Blake Tishman, P.A. v. Baptist Health S. Fla., Inc.*, 2019 WL 3890506 (S.D. Fla. June 10, 2019).........................................................................................................35

*Bobryk v. Durand Glass Mfg. Co.*, 2013 WL 5574504 (D.N.J. Oct. 9, 2013)........37

*Brown v. City of Pittsburgh*, 586 F.3d 263 (3d Cir. 2009)......................................76

*Burson v. Freeman*, 504 U.S. 191 (1992) ...............................................................70

*Byrd v. Aaron's Inc.*, 784 F.3d 154 (3d Cir. 2015) .........................................passim

*Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013) ...........................................46

*Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.,* 781 F.3d 1245 (11th Cir. 2015) ..................................................................................................................................48

*City Select v. BMW*, 867 F.3d 434 (3d Cir. 2017)..................................................50

*Cmty. Vocational Sch. v. Mildon Bus Lines*, 307 F. Supp. 3d 402 (W.D. Pa. 2018) ..................................................................................................................................71

*Cnty. of L.A. v. Mendez*, 581 U.S. 420 (2017)........................................................61

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)......................................................30

*Cooper v. Medimetriks Pharm., Inc.*, 2020 WL 3542429 (D.N.J. June 30, 2020)..61

*Cordoba v. DIRECTV*, 942 F.3d 1259 (11th Cir. 2019) .........................................45

*Cordoba v. DIRECTV*, 2020 WL 5548767 (N.D. Ga. July 23, 2020) ...................45

*Cranbury Brick Yard, LLC v. United States*, 943 F.3d 701 (3d Cir. 2019).............29

*Daisy v. Mobile Mini*, 489 F. Supp 3d 1287 (M.D. Fla. 2021) ...............................44

*Destination Ventures v. FCC*, 46 F.3d 54 (9th Cir. 1995) ......................................71

*Fulton v. City of Phila.*, 141 S. Ct. 1868, (2021) ...................................................71

*Gene & Gene v. BioPay*, 541 F.3d 318 (5th Cir. 2008) .......................32, 33, 34, 41

*Hargrove v. Sleepy's*, 974 F.3d 467 (3d Cir. 2020) ....................................50, 54, 55

*Hayes v. Wal-Mart*, 725 F.3d 349 (3d Cir. 2013) ..................................................46

*Ibanez v. Fla. Dep't of Bus. & Prof. Reg.*, 512 U.S. 136 (1994) ...........................74

*Imhoff Inc. v. Alfoccino, Inc.*, 712 F.2d 1034 (6th Cir. 2015) ...............................48

*In re Citizens Bank, N.A.*, 15 F.4th 607 (3d Cir. 2021)..........................................52

*In re Cmty. Bank*, 418 F3d 277 (3d Cir. 2005).......................................................39

*In re Diet Drugs Prod. Liab. Litig.*, 706 F.3d 217 (3d Cir. 2013) ........40, 47, 48, 51

*In re Hydrogen Peroxide*, 552 F.3d at 318 (3d Cir. 2009).....................................47

*In re Linerboard Antitrust Litig.*, 237 F.R.D. 373 (E.D. Pa. 2006)........................40

*In re School Asbestos Litig.*, 842 F.2d 671 (3d Cir 1988)......................................38

*Inst. for the Dev. of Earth Awareness v. People for the Ethical Treatment of Animals*, 272 F.R.D. 124 (S.D.N.Y. 2011) ........................................................................39

*Iron Branch Assocs., LP v. Hartford Fire Ins. Co.*, 559 F. Supp. 3d 368 (D. Del. 2021) ...................................................................................................................62

*Katz Chiropractic v. Diamond Respiratory Care*, 340 F.R.D. 383 (N.D. Cal. 2021) ............................................................................................................................42, 43

*Kelly v. RealPage*, 47 F.4th 202 (3d Cir. 2022) ....................................................49

*KHS Corp. v. Singer Fin. Corp.*, 2018 WL 4030699 (E.D. Pa. Aug. 23, 2018) ....33, 34, 41

*Kleiner v. First Nat'l Bank*, 751 F.2d 1193 (11th Cir. 1985) ..................................39

*Ladue v. Gilleo*, 512 U.S. 43 (1994) .......................................................73

*Lesende v. Borrero*, 752 F.3d 324 (3d Cir. 2014) ....................................37

*Licari Fam. Chiropractic Inc. v. eClinical Works, LLC*, 2019 WL 7423551 (M.D. Fla. Sept. 16, 2019) ...................................................35

*Malcomb v. Beaver Cnty. Penn.*, 616 F. App'x 44 (3d Cir. 2015) .................................................................................................30, 43

*Marcus v. BMW of N. Am., LLC*, 687 F.3d 583 (3d Cir. 2012) .................28, 30, 46

*Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252 (3d Cir. 1993) .......41

*Mauthe v. Optum, Inc.*, 2018 WL 3609012 (E.D. Pa. July 27, 2018) ....................65

*Mauthe v. Optum, Inc.*, 925 F.3d 129 (3d Cir. 2019) .................................29, 58, 59

*Myrie v. Att'y Gen.*, 855 F.3d 509 (3d Cir. 2017) ....................................29

*Nat'l Inst. of Family & Life Advocs. v. Becerra*, 138 S. 2361 (2018) ....................67

*New Concept Dental v. Dental Resources Systems, Inc.*, 2020 WL 3303077 (S.D. Fla. Mar. 17, 2020) ........................................................61

*Petrucelli v. Bohringer*, 46 F.3d 1298 (3d Cir. 1995) ...........................................53

*Physicians Healthsource v. Cephalon*, 954 F.3d 615 (3d Cir. 2020) ..........31, 34, 55

*Physicians Healthsource, v. Janssen Pharm.*, 2015 WL 3827579 (D.N.J. June 19, 2015) ...................................................................60

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ........................................................67

*Republican Party v. White*, 536 U.S. 765 (2002) ...........................................72

*Russell v. Educ. Comm'n*, 15 F.4th 259 (3d Cir. 2021) ...................................30, 31

*Sawyer v. KRS Glob. Biotechnology*, 2018 WL 4214386 (S.D. Ohio Sept. 5, 2018) ...............................................................................33

*Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011) ....................................................68

*Superior Offshore Int'l, Inc. v. Bristow Grp., Inc.*, 490 F. App'x 492 (3d Cir. 2012) ......................................................................................................................51

*The Fla. Star v. B.J.F.,* 491 U.S. 524 (1989) ........................................................72

*Thompson v. W. St. Med. Ctr.,* 535 U.S. 357 (2002)...............................................76

*TransUnion LLC v. Ramirez,* 141 S. Ct. 2190 (2021)............................................45

*True Health Chiropractic v. McKesson Corp.*, 2020 WL 7664484 (N.D. Cal. 2020) ..................................................................................................................42, 44

*True Health Chiropractic v. McKesson*, 896 F.3d 923 (9th Cir. 2018) ............34, 41

*United States v. Dowdell*, 70 F.4th 134 (3d Cir. 2023) ..........................................56

*United States v. Playboy Ent.*, 529 U.S. 803 (2000) .......................................72, 73

*United States v. United Foods, Inc.*, 533 U.S. 405 (2001) .....................................70

*Va. St. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976) ..................................................................................................................70

*Wachtel v. Guardian Life Ins. Co.*, 453 F.3d 179 (3d Cir. 2006)...........................47

*Wal-Mart v. Dukes*, 564 U.S. 338 (2011)..............................................................31

*Warren Hill, LLC v. SFR Equities, LLC*, 2019 WL 33046935 (E.D. Pa. July 23, 2019) ..................................................................................................................62

*Willey v. Harris Cnty. Dist. Att'y*, 27 F.4th 1125 (5th Cir. 2022) ....................70, 71

*Ybarra v. Dish Network, LLC*, 807 F.3d 635 (5th Cir. 2015) ................................49

**Statutes**

47 C.F.R. § 64.1200(c)(2) ....................................................................................65

47 U.S.C. § 227(a)(5)...........................................................................................60

47 U.S.C. § 227(b)(1)(C) .....................................................................................52

**Rules**

Fed. R. Civ. Proc. 23. ..........................................................................................46

## DEFENDANT-APPELLEE'S PRINCIPAL AND RESPONSE BRIEF

Defendant-Appellee/Cross-Appellant, Fox Rehabilitation Services, P.C. ("Fox" or "Defendant") hereby submits this principal and response brief.

## JURISDICTIONAL STATEMENT

The district court had federal question jurisdiction over Plaintiff Steven A. Conner, DPM, P.C.'s ("Conner" or "Plaintiff")[1] federal Telephone Consumer Protection Act ("TCPA") claims per 28 U.S.C. § 1331, and supplemental jurisdiction over Conner's state law conversion claim per 28 U.S.C. § 1367.

The district court denied Fox's Motion for Summary Judgment ("MSJ") in a Memorandum Opinion and Separate Order, both dated September 6, 2022. APP00096-114 (Mem.); APP00115 (Order). In the same order, the district court denied Conner's Motion for Class Certification. APP00115.

The case proceeded to a bench trial on Conner's individual claims, held from January 23-25, 2023. APP01638-799 (Trs. 1/23/23, 1/24/23, 1/25/23). The district court entered a Memorandum of Decision and separate Order of Decision, both dated February 24, 2023, entering judgment in favor of Conner on his TCPA claims, and in favor of Fox on Conner's state-law conversion claim. APP00118-45 (Mem.); APP00146 (Order). Conner filed his notice of appeal on March 27, 2023. APP00147-49. The district court entered a final judgment awarding $4,000, plus

---

[1] For ease of reading, Fox refers to Plaintiff using Dr. Conner's pronouns.

costs, in favor of Conner on April 3, 2023. APP00150. Fox filed its Notice of Cross Appeal on April 10, 2023. APP01800-02.

This Court has appellate jurisdiction pursuant to 28 U.S.C. §1291 because this appeal is from a final decision of the district court. Fed. R. App. P. 3(a), 4(a)(1), (4).

## STATEMENT OF THE ISSUES

(1)　Did the district court abuse its discretion in denying Conner's motion for class certification for lack of predominance, when the evidence showed that many of the thousands of physicians who may have received Fox's faxes consented to them, were not harmed by them, and received them on technology not subject to the TCPA—and thus where thousands of mini-trials would be required to determine whether Fox is liable to each class member, and whether each has standing?

**Issue raised at:** APP01828-39 (Class Cert. Opp'n); APP01914-26 (Sur-reply).

**Argued and ruled at:** APP00042-45 (Tr. 8/1/22, 12:5-15:19); APP00105-08 (Mem.); APP000115 (Order); APP01788 (Tr. 1/25/23, 34:5-25).

(2)　Did the district court abuse its discretion in denying Conner's motion for class certification because the proposed class was not ascertainable, where the evidence showed that there was no reliable or administratively feasible way to identify class members, because determining which faxes were successfully transmitted would require a recipient-by-recipient inquiry, and because there was no administratively feasible way to reliably match fax numbers as displayed on fax

transmission logs to actual historical recipients?

**Issue raised at:** APP01826-27 (Class Cert. Opp'n); APP01913-14 (Sur-reply).

**Argued and ruled at:** APP00034-42 (Tr. 8/1/22, 4:7-12:4); APP00100-06 (Mem.);
APP00115 (Order); APP01754 (Tr. 1/24/23, 78:14-22).

(3)    Did the district court err in denying Fox's MSJ, where the court
concluded that a genuine dispute of material fact existed about whether the faxes
were advertisements even though dozens of reasonable recipients testified that they
interpreted the faxes as informational notices about Fox's efforts to cope with the
COVID-19 pandemic, and not as promoting the sale of Fox's services?

**Issue raised at:** APP02051-59 (MSJ); APP02253-63 (Reply).

**Argued and ruled at:** APP00077-94 (Tr. 8/18/22, 9:25-26:7); APP00109-14
(Mem.); APP00115 (Order). After the district court denied Fox's MSJ, Fox again
raised this issue at trial. APP01641-42 (Tr. 1/23/23, 10:15-16:9); APP01786-90 (Tr.
1/25/23, 25:22-43:13); *see generally* APP01638-799 (Trs. 1/23/23, 1/24/23,
1/25/23); APP02339-48 (Post-Trial Br.).

(4)    Did the district court err by holding after trial that the faxes were
advertisements under this Court's "reasonable recipient" standard, based solely on
the face of the faxes themselves and to the complete exclusion of all other contextual
evidence showing the faxes to be informational notices about Fox's efforts to cope
with the COVID-19 pandemic, including the testimony of every reasonable

recipient?

**Issue raised at:** APP01641-42 (Tr. 1/23/23, 10:15-16:9); APP01756 (Tr. 1/24/23, 87:15-25; 88:1-19); APP01782-90 (Tr. 1/25/23, 11:4-24, 17:1-15, 22:2-12, 25:22–43:13); *see also generally* APP01638-799 (Trs. 1/23/23, 1/24/23, 1/25/23); APP02339-48 (Post-Trial Br.).

**Argued and ruled at:** APP01786-88 (Tr. 1/25/23, 26:11-33:2); APP00123-33 (Mem.); APP00146 (Order).

(5)     Did the district court err in concluding that it is constitutional to extend the TCPA's fax restriction to faxes with medical information about the COVID-19 crisis—but not other types of odious faxes, such as unsolicited faxes recruiting for Neo-Nazi groups—even though the law is well-settled that the First Amendment prohibits regulation of speech based on its content?

**Issue raised at:** APP02062-77 (MSJ); APP02264-65 (Reply); APP00064 (Tr. 8/1/22, 34:4-12); APP01641 (Tr. 1/23/23, 10:24-11:12); APP02349-50 (Post-Trial Br.).

**Argued and ruled at:** APP00134 (Mem.); APP00146 (Order).

## STATEMENT OF RELATED CASES

Fox is not aware of any current or former cases related to the same, pending in federal or state court.

## STATEMENT OF THE CASE/FACTUAL BACKGROUND

**I.  Relevant Facts.**

**A.  Fox's Business and Interactions with Referring Physician Practices.**

Fox is a clinician-operated healthcare company that provides critical in-home healthcare to tens of thousands of geriatric patients, including physical, occupational, exercise, and speech-language therapy.  APP00098 (Mem.); APP01852 (Hazel Decl. ¶ 3); APP01659, 1694 (Tr. 1/23/23, 81:17-82:11, 223:1-10). Fox's services include treatment for Alzheimer's, Parkinson's, and other conditions, helping patients to improve their ability to function independently.  APP00820-21 (Mason Decl. ¶ 6); APP01059 (Russo Decl. ¶ 7); APP01852 (Hazel Decl. ¶ 3); APP01694 (Tr. 1/23/23, 223:8-10).

Physicians refer patients to Fox when appropriate.  APP00098 (Mem.); APP01520 (Blye Dep. 148:16–19); APP01179 (Banks Decl. ¶ 9); APP00767 (Vinarski Decl. ¶ 5).  But Fox does not sell its services directly to physicians or charge anything to referring physicians.  APP01852 (Hazel Decl. ¶ 3).

Fox has relationships with tens of thousands of physician offices across the country, with many dating back twenty or more years.  *Id.*; *see generally* APP00712-1137 (Decls.).  Fox interacts with these practices mostly through its 63 account managers ("AMs").  APP01867-68 (Blye Decl. ¶ 3); APP01497 (Blye Dep. 55:9–15); APP01430, 1473 (Hazel Dep. 79:23–80:8, 250:24–251:5).  Fox's AMs typically

have multiple points of contact with each office, which often change over time. *See, e.g.*, APP01153 (Dantona Decl. ¶ 4); APP00139 (Brouillard Decl. ¶ 4). Fox's AMs communicate with their various contacts in several ways, including in-person visits and phone calls. APP01867-68 (Blye Decl. ¶ 3); APP01179-80 (Banks Decl. ¶¶ 5, 7).

Many physicians prefer to receive communications via fax. *See, e.g.*, APP00713-15 (Dudak Decl. ¶¶ 4-6, 9 ("I tell all of our referral partners, including Fox, that I prefer to send and receive information about services and patient care via fax"); APP01139-40 (Brouillard Decl. ¶¶ 5-6) (no instance where physician told AM not to fax, only the opposite); *see generally* APP00712-1183 (Decls). Dozens of administrative professionals and/or doctors confirmed via declarations that they voluntarily provided their fax numbers to Fox and otherwise consented to receiving faxes from Fox, including faxes like those at issue in this case, through phone calls, in-person conversations, and other means. *See, e.g.*, APP01084-85 (Reda Decl. ¶¶ 6–8) ("Over the 10+ years we've worked with Fox, I have personally given Fox representatives the Company's business card (which includes the Company's fax number) during many of these visits, specifically so they could send over information to keep us apprised about Fox's services (including updates to services), initiatives, and patient care."); *see generally* APP00712-1183 (Decls.). Fox does not require its AMs to document the permission they receive. APP01868 (Blye Decl. ¶

4); APP01142 (Brouillard Decl. ¶ 13).  It is simply too commonplace, and there is no business reason to document that permission.  *Id.*

**B.    The COVID-19 Pandemic Creates an Emergency for Fox and Its Patients.**

Beginning in early 2020, the COVID-19 pandemic swept across the country. APP01659, 1675 (Tr. 1/23/23, 83:23-84:13, 147:19-148:5); APP01755 (Tr. 1/24/23, 81:15-21); APP01781 (Tr. 1/25/23, 6:5-20, 7:13-8:18); APP01421 (Hazel Dep. 43:24-45:5).  Various federal and state governments and agencies—including the State of Pennsylvania and the Federal Communications Commission ("FCC")— declared emergencies.  APP02102-36.  The FCC, in particular, declared that "a critical component of the nation's efforts to address and contain this health-related emergency is the ability of health care and public safety organizations to communicate directly with the public."  APP02102-05.  The FCC thus exempted certain communications from the TCPA such that "health care providers" could "lawfully communicate information about the novel coronavirus as well as mitigation measures without violating federal law."  APP02102.

The pandemic created an especially acute emergency for Fox's patients, who were typically elderly, vulnerable to COVID-19, and in need of in-person care at a time when many clinics were closing or declining to see patients.  APP01660 (Tr. 1/23/23, 86:1-22); APP01694 (Tr. 1/24/23, 224:16-23); APP01421 (Hazel Dep. 43:24-45:5).  Fox formed a COVID-19 task force which met daily to discuss and

monitor the virus, make necessary clinical care adjustments for its patients, and implement safety measures to protect them.  APP01660 (Tr. 1/23/23, 86:22-87:87); APP01695 (Tr. 1/24/23, 225:6-25); APP01423, 1425 (Hazel Dep. 50:2-9, 61:14-22).

Many physician offices reached out to Fox to ask whether it was continuing to provide care and, if so, how it planned to keep patients safe.  AAP01425 (Hazel Dep. 58:18-59:5); APP01155 (Dantona Decl. ¶ 9); APP01663, 1695 (Tr. 1/23/23, 100:19-101:15, 226:1-6); APP01781 (Tr. 1/25/23, 7:24-8:18); *see generally* APP00712-1183 (Decls.).  As just one example, on March 17, 2020, a physician office wrote in an email to Fox, "clinic care and hospital based therapy for older people is being cancelled left and right due to the current situation with COVID-19" and "what this means for [our] clients is massive interruptions in their care." APP01852, 1857 (Hazel Decl. ¶ 4, Ex. A).  *"*The office therefore asked "[w]ould it be an option [to] transfer these patients to Fox to continue therapy, or is Fox restricting visits as well for safety reasons?" *Id.*

### C. Fox Sends Faxes to Referring Physicians to Inform Them About Fox's Pandemic-Related Operations and Safety Measures.

Fox needed a way to answer physician inquiries about the pandemic quickly and on a large scale.  APP01853 (Hazel Decl. ¶ 5); APP01421 (Hazel Dep. 43:24–45:5).  Its task force thus decided to fax a series of notices to referring physicians informing them that Fox remained open to treat patients, describing the measures Fox took to safely treat patients in new pandemic conditions, and affirming Fox's

social responsibility as a healthcare provider to help slow the spread of COVID-19. APP01421, 1425 (Hazel Dep. 43:24-45:5, 58:18-59:15); APP01661, 1695 (Tr. 1/23/23, 89:4-90:14, 227:6-20). Fox sent a series of eight informational notices via fax from March to June 2020. APP01661, 1664, 1675, 1695 (Tr. 1/23/23, 91:23-92:2, 101:23-24, 148:12-15, 227:16-20); APP01421 (Hazel Dep. 43:24-45:5). Fox sent the notices only to referring physicians who had shared a patient with Fox within the previous three years. APP01665, 1695 (Tr. 1/23/23, 105:4-11, 226:10-14, 227:4-15; APP01476 (Hazel Dep. 265:5-12). That was only 5% of Fox's potential referral sources. APP01665 (Tr. 1/23/23, 107:20-23).

Fox's first fax, sent on March 27, 2020, was in the format of a multi-paragraph letter. APP01853, 1859 (Hazel Decl. ¶ 5, Ex. B). Titled "Fox responds: Helping Flatten the Curve With House Calls," the fax informed recipients that "[w]e wanted to take the opportunity to inform you that FOX Rehabilitation as a practice is continuing to move forward treating your older adult patients" and "CDC recognizes physical, occupational, and speech therapists as essential medical services . . . [that] should in fact continue at this delicate time." *Id.* Fox went on to address its efforts to control the spread of COVID-19 by explaining that its therapy model "has an important role to play in controlling the spread of COVID-19," and that Fox's therapists can contribute to the goal of "flattening the curve" through the use of "universal precautions to prevent virus transmission." *Id.* The March 27 fax

contained no order form, pricing information, request for a referral, or any solicitation of a purchase. *Id.*

Fox sent seven additional one-page notices as the pandemic and COVID-19 treatment protocols evolved. APP01860-66. Each fax bore the title "Fox Responds to COVID-19" and described Fox's efforts to "help[] flatten the curve with house calls." *Id.* The faxes made frequent use of terms that were both specific to the pandemic and outside the ordinary course of Fox's pre-pandemic operations, such as "flatten the curve," "controlling the spread of COVID-19," and "enhanc[ing] social distancing." *Id.* Like the March 27 fax, none of Fox's following faxes contained pricing or order information. *Id.*; APP01652 (Tr. 1/23/23, 54:15-16). Nor did they contain order forms or referral forms or ask for a referral. APP01860-66. There is no request in any of the faxes that the recipients buy anything, nor are they able to do so because Fox doesn't sell anything to physicians. *Id.*

### D. Openfax's Transmission Logs Are Unreliable, as the CEO of Openfax Confirmed.

Fox used a third-party vendor, Openfax, to send the faxes. APP01742 (Tr. 1/24/23, 31:1-2). Openfax maintains logs of the attempted fax transmissions, which include a notation about whether each attempted transmission was "successful." APP01745-46 (Tr. 1/23/23, 44:18-45:3).

Brett Kokinadis, Openfax's President, submitted two declarations to the district court about Openfax's transmission logs. APP00623-703; APP00708-11.

Mr. Kokinadis's first declaration, submitted by Conner, explained that a "successful" transmission, as denoted on Openfax's logs, means that "a fax has been successfully received by the recipient equipment using an exchange of electronic signals between the sending and receiving equipment." APP00624 ¶ 5.

But Mr. Kokinadis's first declaration omitted key additional information, presumably because Conner's counsel left it out, choosing to submit what they viewed as favorable tidbits via declaration instead of deposing Mr. Kokinadis, which they never sought to do. APP00623-703. As Mr. Kokinadis explained in a second declaration obtained by Fox, however, a "successful" entry does not necessarily mean the recipient's machine printed the fax (or that it was successfully emailed, in the case of emailed faxes). APP00710 ¶ 5. Nor does a "successful" transmission even mean that the fax tied up the recipient's line, such that the recipient's machine could not send or receive other faxes. *Id.* According to Mr. Kokinadis, "[t]he only way Openfax would know for sure whether there was a truly successful transmission that printed in the recipient's fax machine (for traditional fax machines), showed up in the recipient's email inbox (for virtual services), or tied up the recipient's fax line is by speaking to each intended recipient to confirm the same." *Id.*

### E. Physicians That Received the Faxes Found Them Timely and Medically Helpful.

Dozens of physician offices that received Fox's notices—many of which had specifically inquired about Fox's plans to cope with the pandemic—submitted

declarations (and live trial testimony) confirming that they overwhelmingly found them "very helpful" and informative. *See, e.g.,* APP00754 (Spronz Decl. ¶ 9); APP01113 (Levin Decl. ¶ 6); AAP01756 (Tr. 1/24/23, 87:15-88:19); APP01782-84 (Tr. 1/25/23, 11:4-24, 16:23-17:15, 18:5-19:16); *see generally* APP00712-1183 (Decls.). These recipients did not consider the faxes to be ads or interpret them as sales promotions. *See, e.g.,* APP00848 (Merritt Decl. ¶ 9); APP00860 (Hemmen Decl. ¶ 7); APP01739, 1756, 1761-62 (Tr. 1/24/23, 20:4-9, 86:5-10, 106:2-9, 112:2-8); APP01782-85 (Tr. 1/25/23, 11:15-24, 20:20-21:1); *see generally* APP00712-1183 (Decls.).

One recipient, for example, declared that the fax he received "was important to me because I need to understand what home health services are available to my patients and what is being done to protect them from COVID-19 and make informed medical decisions about what care I should refer my patients to." APP00753-54 (Spronz Decl. ¶¶ 8-9). Another declared that "any doctor's office would want this information to better serve their patients. We certainly did." APP01126-27 (Ziska Decl. ¶ 6). The faxes, after all, communicated "important information regarding patient treatment during" an "emergency crisis" that was especially relevant to the care of elderly patients. APP01085 (Reda Decl. ¶ 7); APP00740-41 (Wasserman Decl. ¶ 5). Patients too found the information contained in Fox's faxes to be helpful and timely. *See, e.g.*, APP01085 (Reda Decl. ¶ 7) ("important information regarding

patient treatment during" an "emergency crisis" that both we and our patients needed); APP00847 (Merritt Decl. ¶ 7 ("very important" information "critical for our elderly patients"); APP00807 (Gruning Decl. ¶ 8 ("helpful" information, which "[m]any of our patients benefitted from"); *see generally* APP00712-1137 (Decls.).

Two fax recipients testified at trial. *Both* considered the outbreak of COVID-19 in early 2020 as important context for understanding the faxes, including because patients were asking "every day, all day" for information about what types of healthcare they could continue to receive during the pandemic and how it could be provided safely. APP01781 (Tr. 1/25/23, 6:5-24). They testified that the faxes "let[] us know" that Fox was "responding to the COVID-19," could continue to safely treat "geriatric patients" consistent with CDC guidelines, and could teach patients about measures to help slow the spread of the disease, like "proper handwashing, and social distancing, and things like that." APP01782-84 (Tr. 1/25/23, 11:5-12:13, 16:23-19:16); *see also* APP01756 (Tr. 1/25/23, 87:17-25) (testifying that faxes were "very helpful. At that point in time, our office was fielding phone calls regularly all day every day from patients about this"). They thus did not view the faxes as "promoting" services for sale. APP01784 (Tr. 1/25/23, 19:6-11). Rather, Fox was "just being informative." *Id.*; *see also* APP01760, 1762 (Tr. 1/24/23, 104:13-19, 112:2-8).

Fewer than 1 in 1,000 recipients opted out of receiving these faxes even

though the opt-out process took only 30 seconds to complete. APP01687 (Tr. 1/23/23, 196:16-25); APP01743, 1752 (Tr. 1/24/23, 33:11-20, 71:11-17).

## II. Procedural History.

### A. Conner Filed this TCPA Class Action and Had Ten Months of Discovery Before Moving for Class Certification.

Conner received Fox's notices because one of his patients had been treated by Fox on 34 occasions. APP01649, 1666-67, 1669, 1696-97, 1699 (Tr. 1/23/23, 43:16-19, 110:6-13, 116:1-15, 124:12-17, 232:82-22, 233:1-24, 242:8-16). Conner nevertheless sued Fox on April 2, 2021, alleging that Fox violated the TCPA by sending him the notices without his consent. APP00165-207 (Compl.). Conner also sought to represent a putative class. *Id.*

Discovery opened on June 29, 2021, and continued for ten months before Conner moved for class certification. During that time, Conner served two sets of written discovery on Fox, and Fox made eight productions to Conner consisting of more than 8,600 pages. APP01961-62 (Vartanian Decl. ¶¶ 4-5). The productions included fax transmission reports, documents regarding Conner, emails regarding the notices, and contact information for all intended recipients. *Id.*

Conner also deposed four Fox employees: Chief Development Officer, Jason Hazel; VP of Technology, Michael Sokorai; Director of Sales, Matthew Blye; and Senior Creative Director, Megan Devine. Some of Fox's employees testified about its CRM database, Salesforce, which houses basic information about more than

82,000 physician offices.  *See, e.g.*, APP01514-17 (Blye Dep. 122:5-137:9).  Fox did not produce any Salesforce records because they were not responsive to any of Conner's discovery requests.  APP01848-50 (Class Cert. Opp'n).  Nor were they relevant to class certification because Fox: (1) did not use Salesforce to create the list of intended recipients; and (2) does not track consent to fax physicians in Salesforce; and (3) does not even track a large portion of interactions with physicians in Salesforce.  APP01868 (Blye Decl. ¶ 4); APP01142-43 (Brouillard Decl. ¶ 13); *see generally* APP01138-83 (AM Decls.).  Conner nonetheless moved to compel disclosure of the Salesforce records.  APP00531-50 (Mot. to Compel).

Though Fox produced contact information for putative class members in September 2021, Conner chose not to interview or depose putative class members. APP01993 (Opp'n to Mot. to Stay).  Conner could have contacted these individuals by simply faxing them or using Google to find additional contact information.  *Id.* And even after Fox provided more detailed contact information for putative class members and Conner learned Fox was interviewing them, Conner still decided not to contact them, knowing their testimony would only hurt his case.  *Id.*

Eight months after class certification discovery began, Conner moved to stay the deadline for his class certification motion, pending a ruling on his discovery motions.  APP00551-54 (Mot. to Stay).  He did so just six days before his filing deadline, despite already receiving a two-month extension.  APP01992 (Opp'n to

Mot. to Stay). That same day, Conner filed a third motion improperly seeking to compel Fox's work-product communications with putative class members to obtain declarations it might, but would not necessarily, use to oppose certification. APP00569-78 (Mot. to Compel).

Conner claims the district court ignored the issues raised in Conner's discovery motions and *sua sponte* stayed discovery. Br. 24. In reality, the court set a hearing on all three motions and ordered that no more discovery motions be filed until then. APP00585-86 (Order). At the hearing, the court asked Conner why it needed additional discovery to prepare its certification motion. Conner couldn't give a satisfactory reason. APP00024 (Tr. 4/27/22, 23:16-20). Instead, Conner's counsel conceded that it never served any discovery requests for Salesforce records and had not provided ESI search terms to Fox: "COURT: Is it correct that you did not have any discovery requests that mentioned Salesforce, and you still haven't served any search terms on defendant, is that correct? MR OPPENHEIM: Well, yes." APP00019 (Tr. 4/27/22, 18:10–14).

Exercising its discretion, the court determined Conner already had more than enough discovery to move for certification. APP00024-25 (Tr. 4/27/22, 23:10-24:19). It thus gave Conner an extra fourteen days to do so and stayed discovery pending the briefing. APP00025-29 (Tr. 4/27/22, 24:16-19, 28:17-18). But it gave Conner the opportunity to identify any additional discovery he claimed to need in

his class certification brief. *Id.*

**B.    Conner Moved for Class Certification over a Year into the Case, Which the District Court Denied and this Court Declined to Review.**

On May 11, 2022, Conner moved to certify the following class: "All persons and business entities sent one or more" of the faxes Conner received "identified as a 'successful' transmission" on "reports from Openfax." APP00596.

The *only* evidentiary basis Conner offered to ascertain the persons or businesses in the class was Openfax's logs noting which transmissions were "successful" and a declaration from Openfax's CEO describing those logs. *See generally id.* Conner did not seriously take up the district court's offer to identify additional discovery that would have been material to class certification. Indeed, Conner's motion vaguely mentioned in passing that "the Court should [o]rder Fox to produce the Salesforce records" so that Conner could "have a more complete picture of the interactions between the [AMs]" and physician offices. APP00599, 620. Conner did not submit a single putative class member declaration, tacitly recognizing that such testimony would not support his bid for certification. Nor did he produce any other evidence in support of his motion.

Fox, by contrast, submitted over 600 pages of evidence, including a rebuttal declaration from Openfax confirming its transmission logs are unreliable. Fox also submitted declarations from 31 referring physicians and several Fox employees,

confirming that putative class members consented to receive the notices from Fox, used technology not subject to the TCPA to receive them, and were not injured because the notices benefitted them and their patients.  APP00712-01183 (Decls.).

Rather than producing its own supporting evidence, Conner focused his efforts on trying to exclude the evidence Fox obtained.  This was not successful. The district court denied Conner's motion to strike the declarations of 31 putative class members that Fox filed in support of its opposition to certification, as well as Conner's motions to compel Fox's Salesforce records and communications with putative class members.  APP00117 (Order); APP00116 (Order).  The district court denied Conner's motion to certify, for the reasons discussed at length below.

Conner then sought interlocutory review of the denial of class certification and discovery orders, which this Court denied on December 5, 2022.  No. 22-8048, Dkt. 15 (Order).

### C.     The District Court Denied the Parties' Cross Motions for Summary Judgment.

The parties filed cross motions for summary judgment on whether the notices were advertisements.  APP02029-85 (Fox's MSJ).  In support of its motion, Conner filed a declaration from an expert, which it had not previously disclosed.  APP01341-46 (Howard Decl.).  Conner ultimately withdrew the declaration after Fox moved to exclude it under *Daubert* and as untimely because the expert disclosure deadline had long passed.  APP02330-33 (Resp. to Mot. to Exclude); APP01636-37 (Order).

The district court denied both summary judgment motions, and the case proceeded to trial on Conner's individual claims. APP000115 (Order); APP00096-114 (Mem.); APP01636-37 (Order).

### D. The Evidence at Trial Further Confirmed No Class Could Be Certified and that the Notices Were Not Advertisements.

The evidence at trial confirmed that the notices were not advertisements. As detailed in Section I.C. above, Fox employees testified that they sent the notices in response to questions from referring physicians wanting to know whether Fox would continue to care for elderly patients during the unprecedented COVID-19 crisis and whether it could do so safely. APP01663, 1695 (Tr. 1/23/23, 100:19-101:15, 226:1-6); APP01640 (Tr. 1/25/23, 7:24-8:18). Fox distributed the notices out of concern for patients' wellbeing, to provide a lifeline to older adults who were not receiving critical care because of COVID-19. APP01661 (Tr. 1/23/23, 90:18-92:2); APP01641 (Tr. 1/24/23, 11:9-25).

Consistent with its purpose to inform physicians about treatment options that remained available for elderly patients (APP01661, 1695 (Tr. 1/23/23, 89:4-16, 228:3-6); APP01641 (Tr. 1/24/23, 10:25-11:8)), Fox sent the faxes only to referring physicians who had a shared patient with Fox within the previous three years (APP01641, 1645, 1665, 1695-96 (Tr. 1/23/23, 9:3-15, 27:5-13, 105:4-11, 107:24-108:3, 226:10-14, 227:4-15, 232:6-20)) That group comprised just 5% of its potential referral sources. APP01665 (Tr. 1/23/23, 107:12-23).

19

The faxes did not ask recipients to buy anything, and Fox does not sell anything to recipients. APP01653 (Tr. 1/23/23, 58:17-20). The faxes did not contain order forms or referral forms and did not ask for a referral. APP01666 (Tr. 1/23/23, 112:2-8). And the faxes contained no pricing or order information. APP01652 (Tr. 1/23/23, 54:15-16).

Fox did not track whether the notices generated any referrals. APP01677 (Tr. 1/23/23, 154:4-10). There is no evidence that Fox received a single referral because of the faxes. APP01677 (Tr. 1/23/23, 154:11-13). In fact, referrals to Fox significantly decreased from March to June 2020. APP01676-77 (Tr. 1/23/23, 149:24-150:5, 154:14-16). Year-over-year growth also significantly decreased. APP01670 (Tr. 1/23/23, 127:19-23). Fox was only profitable in 2020 because of government grants and increased Medicare reimbursement. APP01670 (Tr. 1/23/23, 128:9-22).

As the district court noted, the evidence at trial confirmed that no class could be certified:

> THE COURT: And so -- and I have been, I think, very open about letting you both make a record. But the one other thing I want to say, and I know the Conners will not agree with this, but in my view, one thing the testimony has shown, that this is inappropriate for a class action, and that my decision about the denying a class because it is not ascertainable I think remains even stronger based on the testimony that we've had.

APP01658 (Tr. 1/24/23, 78:14-22). After hearing live testimony from witnesses

who received the transmissions electronically, instead of on a fax machine, the district court further noted that individualized issues regarding whether the notices were received electronically "would be another reason why a class action was not appropriate in this case." APP01647 (Tr. 1/25/23, 34:19-24).

After trial, the district court correctly held that Conner had failed to carry his burden to prove conversion. APP00123, 136 (Mem.). It also held that Fox did not willfully violate the TCPA.[2] APP00135 (Mem.). But the court also erroneously held the notices were advertisements and, since Conner had not consented to receive them, sending them to Conner violated the TCPA. APP00133 (Mem.). In so holding, the court felt compelled by this Court's recent TCPA decisions to ignore extensive evidence establishing that the faxes were not advertisements because a reasonable recipient would view them as containing helpful medical information, not as promoting a sale. APP00125-29 (Mem.). And the court declined Fox's

---

[2]    Conner's willfulness argument rode on an incomplete letter a third party sent to Fox. APP01687 (Tr. 1/23/23, 195:5-196:18). The letter was inadmissible because no testimony authenticated it and its content is hearsay. Fed. R. Civ. P. 56(c)(2). The letter also amounts to "mere allegations," and conclusory ones at that. *Waris v. HCR Manor*, 2009 WL 330990, at *1 n.2 (E.D. Pa. Feb. 10, 2009), *aff'd*, 365 F. App'x 402 (3d Cir. 2010). And the letter is a compromise offer that cannot be used to "prove" the "validity or amount of a disputed claim." Fed. R. Evid 408(a). Nor did the letter establish that even one putative class member thought the notices were an advertisement as the sender never actually sued Fox or provided any testimony. In contrast, Fox submitted 31 declarations confirming that the notices conveyed helpful medical information, not the impression that Fox was trying to sell something. APP00712-1137.

argument that extending the TCPA to restrict even faxes about an unprecedented medical crisis like COVID-19 violates the First Amendment. APP00134 (Mem.).

Fox cross-appeals to seek reversal of the district court's order that the faxes were "advertisements" and its judgment in favor of Conner on his TCPA claim.

## SUMMARY OF ARGUMENT

The district court acted squarely within its discretion in denying Conner's motion for class certification for many independent reasons.

Most importantly, the district court faithfully applied the significant evidence before it in finding that consent could not be determined on a classwide basis, precluding predominance. Consent is a complete defense to a TCPA claim. Here, dozens of physician practices testified through declarations, and against their own financial interest as putative class members, that they had expressly consented to receive faxes from Fox. All third-party trial witnesses concurred.

Fox obtained that consent in many ways over a long period, without recording the consents, much less in any central database. Thus, the only way to determine which recipients consented to receive faxes from Fox, and which did not, would be to ask each—as well as each of the hundreds of Fox AMs they communicated with over the years—individually. As the district court correctly concluded, that highly individualized inquiry defeated any showing of predominance. The Court should affirm the denial of certification for this reason alone, as every United States Court

of Appeals has done in similar circumstances.

Individualized virtual fax and standing issues likewise defeated predominance, confirming the district court properly denied certification. First, if a fax is received on a virtual fax service—via email—as opposed to on a traditional machine, there is no viable TCPA claim. And all putative class members require standing to recover. So Conner must be able to resolve both issues on a classwide basis, or certification must be denied. Dozens of physician practices declared they found the faxes helpful, not harmful, and that they received the notices by email, two of which also so testified at trial. The district court thus correctly found that these were "precisely the type of 'individualized inquir[ies]'" that "defeat[] class certification." APP00106 (Order); APP01788 (Tr. 1/25/23, 34:19-24).

Nor did the district court abuse its discretion in finding the proposed class was not ascertainable. Following extensive briefing and argument, the court found that Conner had offered no administratively feasible or reliable way to determine which of the 144,868 faxes sent on Fox's behalf were actually received by the 20,609 intended recipients. Conner now complains that the district court based that finding on an "erroneous understanding" of Openfax's transmission logs, even though Openfax's President declared that its logs do not confirm the fax transmissions went through. The district court did not abuse its discretion by relying on that unrebutted testimony, particularly given that Conner could have deposed Mr. Kokinadis but

chose to attempt to ambush Fox with a declaration that omitted critical material—which Fox corrected with a supplemental declaration from Conner's own witness.

The district court was again correct in finding that, even if the Openfax records did reflect successful transmissions (which they did not), there still would be no reliable or administratively feasible mechanism to match fax numbers with the identities of actual class members (*i.e.*, the persons or businesses who received the transmissions). Conner effectively conceded this issue before the district court by arguing that class member identification would "all get sorted out in the notice process," without specifying how that would be done. APP00036 (Tr. 8/1/22, 6:3-4). The district court correctly held that this rank speculation was no substitute for a feasible method of class member identification at the time of class certification.

Having all but conceded that the district court was right on substance, Conner turns to complaints about discovery procedures, arguing that ten months of discovery—several multiples of the 90 days many districts permit by local rules—during which he received many thousands of documents and took several depositions, was not enough. But the district court had discretion to place reasonable limits on discovery, and to decide that Conner had ample time and opportunity to develop a record in support of his motion for class certification. Even now, Conner makes no showing that any of the additional discovery—most of which he *never requested* before the district court—would make any difference to the outcome of

his class certification motion.

Although the district court's conclusions were correct as to class certification, it did err in adjudicating Conner's individual TCPA claim. Though it initially denied the parties' motions for summary judgment on the issue, the court ultimately held after trial that Fox's eight faxes were "advertisements" under the TCPA. But the district court did so only because it thought that a Third Circuit decision issued the day before trial, *Mauthe v. Millennium Health, LLC*, 58 F.4th 93 (3d Cir. 2023), prohibited it from considering any evidence outside the four corners of the faxes, such as the context under which they were sent or received. This resulted in the district court reaching the *opposite* conclusion of the dozens of "reasonable recipients" who testified against their financial interest that the faxes were *not* ads, but helpful medical notices.

In doing so, the district court misread *Millennium*, which itself endorsed a "reasonable recipient" approach, not the "evidentiary blinders" rule that Conner's counsel convinced the district court to follow. This Court has never adopted the latter view, and several courts in this circuit have considered all available evidence— including evidence extrinsic to a fax—in deciding whether it is an advertisement. In fact, this Court considered such evidence in *Millennium* itself. And that makes logical sense: how could a district court determine how a "reasonable recipient" would interpret a transmission without considering evidence of context?

Even when examined on their contents alone, the faxes here are not advertisements. They did not ask the recipients to buy anything. They did not ask for a referral. They did not contain order forms. They did not contain referral forms. They contained no pricing information. But it is when the faxes are viewed in their full context—which the district court believed it could not do—that their informational nature becomes fully apparent to any "reasonable recipient."

That context showed that Fox chose to send the faxes, not as part of its ordinary-course marketing efforts, but in response to inquiries received from physician practices, which were trying to determine whether Fox was one of the many home-health companies that had either closed shop or greatly restricted activities in response to the COVID-19 pandemic. And the evidence showed that Fox sent them only to 5% of its referral sources, those who recently shared a patient with Fox such that they would need the information contained therein to ensure continuity of care for shared patients at the very beginning of the pandemic.

The contents of the faxes were also narrowly tailored to the pandemic and spoke in a language unknown to the pre-pandemic world, with frequent use of phrases like "flatten the curve," "social distancing," and "controlling the spread of COVID-19." The faxes' evident purpose was to inform the reader of Fox's efforts to ensure patient safety, rather than to solicit purchases of Fox's ordinary-course home-based therapy services.

The district court also ignored dozens of declarations from physicians' offices that had received the faxes, as well as their trial testimony. *Every single witness* testified that they viewed the faxes as helpful, COVID-related informational communications—not advertisements. Evidence that these real-life, reasonable recipients of the faxes did not view them as promoting the sale of Fox's services should have been considered in deciding whether the faxes were ads for purposes of the TCPA.

Finally, if the Court declines to reverse on the issue of whether the faxes qualify as advertisements, it will need to reach the issue of whether the TCPA's fax ban is a content-based restriction on free speech that violates Fox's First Amendment rights. In purporting to ban faxes that promote goods or services for sale—but no other faxes, regardless of their content—the TCPA singles out a subset of commercial communications based solely on what they say. That statutory regime cannot survive the strict constitutional scrutiny under which content-based restraints on speech are reviewed.

This Court should affirm the district court's denial of Conner's motion for class certification and reverse the denial of Fox's motion for summary judgment, as well as the judgment at trial holding that the faxes at issue violated the TCPA.

# ARGUMENT

## I. Standard of Review for the Issues on Appeal.

An order denying a motion for class certification is reviewed for abuse of discretion. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012). An abuse of discretion occurs if "the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Id.* (citing *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2009)) (cleaned up). "[W]hether an incorrect legal standard has been used is an issue of law to be reviewed *de novo*." *Id.*

This Court reviews the "denial of summary judgment de novo." *Cranbury Brick Yard, LLC v. United States*, 943 F.3d 701, 708 (3d Cir. 2019). In doing so, it applies "the same standard as the District Court to determine whether summary judgment" should have been granted. *Mauthe v. Optum, Inc.*, 925 F.3d 129, 133 (3d Cir. 2019).

This Court must similarly review the district court's trial judgment *de novo* because the question of whether a fax constitutes an "advertisement" under the TCPA is a question of law. *Armann v. McKean,* 549 F.3d 279, 288 (3d Cir. 2008). Constitutional questions are also reviewed *de novo*. *Myrie v. Att'y Gen.*, 855 F.3d 509, 515 (3d Cir. 2017).

Finally, it is well-settled that this Court may "affirm a district court for any

reason supported by the record[,]" regardless of whether the district court addressed it. *Malcomb v. Beaver Cnty. Penn.*, 616 F. App'x 44, 45 (3d Cir. 2015).

## I.    The District Court Correctly Denied Conner's Motion for Class Certification.

### A.    Legal Standard Applicable to Certification: Conner Bears a Heavy Burden to Prove Each Element of Rule 23.

Certification under Rule 23(a) requires a plaintiff to show "sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quotations omitted).  Under Rule 23(b), Conner must also prove that the class is "currently and readily ascertainable," and that "questions of law or fact common to class members predominate over any questions affecting only individual members." *Marcus*, 687 F.3d at 593; *Russell v. Educ. Comm'n*, 15 F.4th 259, 266 (3d Cir. 2021) (quotation marks omitted); *Byrd v. Aaron's Inc.*, 784 F.3d 154, 162 (3d Cir. 2015).

Rule 23's requirements are stringently applied.  *Russell*, 15 F.4th at 265; *see also Byrd*, 784 F.3d at 163 (stating that the court must "conduct a rigorous analysis" to determine whether a plaintiff has satisfied the requirements for class certification). Conner "bears the burden" to prove by a "preponderance of the evidence" that each of Rule 23's multiple requirements is satisfied.  *Wal-Mart v. Dukes*, 564 U.S. 338, 349-50 (2011).

**B.** **The District Court Did Not Abuse Its Discretion in Holding that Conner Failed to Prove Predominance.**

The district court held that "Conner's class cannot be certified" because he did not prove that common issues "predomina[t]e" over questions affecting individual members. APP00107 (Mem.). That was not an abuse of discretion, but any other ruling would have been.

**1.** **Individualized Issues of Consent Precluded Predominance.**

Just as every court has in similar circumstances, the district court correctly found here that individualized issues of consent, which is a complete defense to TCPA claims, would predominate over any classwide issues in determining liability. *See generally Physicians Healthsource v. Cephalon*, 954 F.3d 615, 619 (3d Cir. 2020) (stating that "[p]rior express invitation or permission" is a complete defense to a TCPA fax claim, and "[t]he voluntary provision of a number—phone or fax— by a message-recipient to a message sender, constitutes express consent . . . if the message relates to the reason the number was provided.").

At the class certification stage, Fox need not prove that it will prevail on its consent defense as to each class member, contrary to Conner's contentions (Br. 56), as that would turn Rule 23 on its head. That is because predominance focuses only on whether there are "questions affecting only individual members." Fed. R. Civ. Proc. 23(b)(3). Those "questions" can arise from defenses or the elements of a plaintiff's claim. Thus, it has long been settled that "class certification is

inappropriate if individual defenses will be widespread through the class and vary significantly among class members." *Ritti v. U-Haul Int'l, Inc.*, 2006 WL 1117878, at *11 (E.D. Pa. Apr. 26, 2006) (citing *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 162 (3d Cir. 2002)); *Gene & Gene v. BioPay*, 541 F.3d 318, 329 (5th Cir. 2008) 541 F.3d at 318 (in reversing an order certifying a TCPA class for lack of predominance, rejecting the relevance of whether "consent [is] an affirmative defense [or] an element of the cause of action").

As such, to preclude certification, it is enough that Fox present "sufficient, non-speculative evidence that a *bona fide* issue of consent exists." *Sawyer v. KRS Glob. Biotechnology*, 2018 WL 4214386, at *9 (S.D. Ohio Sept. 5, 2018); *see also BioPay*, 541 F.3d at 329 (affirming denial of class certification given the plaintiff's failure "to advance any viable theory employing generalized proof concerning the lack of consent to the class involved in the case"). Conner must then show "a viable theory employing generalized proof to establish [consent] with respect to the class involved." *Id.* at 318. Conner has not done so, instead conceding that proof of Fox's consent defense would require an inquiry into whether "every target of the fax broadcasts" consented. Br. 57.

This concession is unsurprising, as putative TCPA class actions generally fail for lack of predominance unless the defendant obtained all numbers contacted from one source, such as a third-party lead generator, such that the question of consent

can be decided on a classwide basis. *KHS Corp. v. Singer Fin. Corp.*, 2018 WL 4030699, at *4 (E.D. Pa. Aug. 23, 2018) (distinguishing TCPA fax cases where consent is obtained in "various, unique ways," such as "through networking or on cold calls," thus requiring "thousands of mini-trials on the individualized issue of consent" with those where "the sender obtained the numbers by purchasing a list" and thus "the question of consent may be a common one and allow for certification"); *True Health Chiropractic v. McKesson*, 896 F.3d 923, 931 (9th Cir. 2018).

Certification is particularly inappropriate, on the other hand, where, as here, consent was obtained through "individual communications and personal relationships" because "[t]he variation in such communications and relationships" makes it impossible to decide consent with common proof. *True Health*, 896 F.3d at 93; *see also BioPay*, 541 F.3d at 329; *KHS Corp.*, 2018 WL 4030699, at *4 (denying certification where defendant obtained consent from years of networking, which "would require immense court resources to sort out the possible unique paths of each class member to [defendant's] contact list"); *Physicians Healthsource*, 340 F. Supp. 3d at 453 (finding undisputed evidence of consent in TCPA fax case where defendant's representatives collected physician's business card containing his fax number during in-person meetings about defendant's products), *aff'd*, 954 F.3d 615 (3d Cir. 2020).

Even more so than in these cases and dozens of others like them, individualized issues of consent alone preclude certification here. The evidence before the district court—including deposition testimony, numerous AM declarations, and almost three dozen putative class member declarations—confirms that Fox sent the notices to offices that consented to receive them in myriad ways over many years during hundreds of thousands of individual in-person meetings with physicians and their staff. APP00712-1183 (Decls.). That evidence, standing alone, was more than sufficient to not only justify—but require—denial of class certification. That is particularly true given that the evidence here is more substantial than in other cases denying certification on such grounds. *Licari Fam. Chiropractic Inc. v. eClinical Works, LLC*, 2019 WL 7423551, at *11 (M.D. Fla. Sept. 16, 2019) (holding, as here, that defendant's testimony and customer declarations "provided sufficient, non-speculative evidence demonstrating that the issue of consent is individualized and will predominate in this matter"); *Blake Tishman, P.A. v. Baptist Health S. Fla., Inc.*, 2019 WL 3890506, at *18 (S.D. Fla. June 10, 2019) (finding sufficient evidence of consent in three putative class member declarations); *Craftwood II, Inc. v. Wurth Louis & Co.*, 2018 WL 6258883, at *8 (C.D. Cal. Oct. 2, 2018) (similar). So was similar testimony presented at trial, even on Conner's cross-examination. And the evidence that Fox obtained consent in many ways, over a period of many years, remains both voluminous and unrebutted. *See* above at

Sections I.B., E. Conner failed to muster evidence that even a *single* other recipient did not consent to the faxes.

The physician declarations also contradict Conner's argument that "no class member provided prior express permission to receive Defendants' Covid-19 faxes." Br. 57. On the contrary, numerous members of the putative class testified that they consented to receiving faxes like those at issue in this case by providing their fax numbers to Fox, through in-person conversations, or through other acts of consent. APP00712-01137. This Court has held that "voluntary provision of a number— phone or fax—by a message-recipient to a message-sender, constitutes express consent such that a received message is solicited and thus not prohibited by the TCPA, if the message relates to the reason the number was provided." *Cephalon*, 954 F.3d at 619. The *Cephalon* Court held that this was satisfied by a recipient's mere "provi[sion] [of] its fax number to Defendants via business cards," which is far less express than the consent at issue here. *Id.* at 617.

Conner argues that the district court erred by considering the declarations because they resulted from allegedly improper *ex parte* communications with class members. But Conner's counsel *agreed* that there was nothing wrong with the way Fox obtained declarations from potential class members. APP00047 (Tr. 8/1/22, 17:1-4) (arguing that "the problem is not the fact that [the declarations] exist. The problem is that these witnesses and these declarations and this information, this

factual information was withheld during the discovery process."). Conner "cannot on appeal assume a contrary position simply because the decision in retrospect was a tactical mistake, or perhaps a candid but regretted concession.'" *Lesende v. Borrero*, 752 F.3d 324, 337 (3d Cir. 2014).

In any event, Conner's argument that defendants cannot communicate with third-party witnesses to obtain evidence before certification is nonsensical and unsupported by any authority. It is well-established that defendants are entitled to communicate with prospective class members for the purpose of gathering evidence. That is true even where the defendant has substantial leverage over the declarant, like in an employer-employee relationship, the opposite of the situation here. *Bobryk v. Durand Glass Mfg. Co.*, 2013 WL 5574504, at *3 (D.N.J. Oct. 9, 2013) ("'As a general matter, employers are free to communicate with unrepresented prospective class members about the lawsuit and even to solicit affidavits from them concerning the subject matter of the suit.'") (quoting *Longcrier v. HL–A Co.*, 595 F. Supp. 2d 1218, 1226 (S.D. Ala. 2008)); *Becker v. Bank of N.Y. Mellon Tr. Co., N.A.*, 2012 WL 13018242, at *3 (E.D. Pa. Dec. 18, 2012) (refusing to limit defendant's communications with putative class members where there was no evidence that communications were false or misleading).

Conner's attempt to invent a rule prohibiting communications with potential class members *before* certification (when there is no "class") is entirely without

support. The cases on which Conner relies are inapposite because they relate to communications with class members *after* certification (when there is a class represented by class counsel). *In re School Asbestos Litig.*, 842 F.2d 671, 683 (3d Cir 1988) (vacating trial court order requiring defendant to post a pre-written notice whenever it communicated "in any manner" with class members); *Kleiner v. First Nat'l Bank*, 751 F.2d 1193, 1206 (11th Cir. 1985) (affirming sanctions against defendant bank that pressured members of certified class composed of its own borrowers, who were dependent on the bank for financing, to opt out of class action); *In re Cmty. Bank*, 418 F.3d 277, 310-13 (3d Cir. 2005) (addressing communications from law firms urging class members to opt out).

Conner's argument that Fox was obligated to produce copies of the declarations during discovery is also wrong. Br. 62. "Executed affidavits of non-party witnesses remain[] work product until the lawyer elect[s] to serve and file them. Until the moment of service and filing, the lawyer reserves the right to reverse course and refrain from using the affidavits." *Inst. for the Dev. of Earth Awareness v. People for the Ethical Treatment of Animals*, 272 F.R.D. 124, 125 (S.D.N.Y. 2011); *see also In re Linerboard Antitrust Litig.*, 237 F.R.D. 373, 384, n. 10 (E.D. Pa. 2006) (granting motion to preclude production of signed witness statements because they are work product). Conner cites no authority to the contrary.

Nor can Conner establish that he had a "substantial need" for Fox's work

product, as he now argues for the first time on appeal (Br. 63) and has thus waived. *In re Diet Drugs Prod. Liab. Litig.*, 706 F.3d 217, 226 (3d Cir. 2013); *see also* APP00587-622 (Class Cert. Mot.) (no such argument made); APP01184-211 (Reply) (same); APP01212-17 (Mot. to Strike) (same). The argument lacks merit in any event, because, as noted above, Fox produced contact information for putative class members in September 2021, when it produced the fax transmission logs with the fax numbers. APP01847 (Opp'n to Mot. to Stay). Conner could have contacted these individuals to discover their testimony but chose not to. *Id.* Conner cannot show that he was "unable without undue hardship to obtain the substantial equivalent" of the declarations, and thus cannot make a showing of "substantial need" to discover Fox's work product. *Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252, 1256 (3d Cir. 1993).

In any event, Conner's complaints about the physician declarations are irrelevant because trial testimony by physician office personnel and the numerous declarations and trial testimony by Fox's employees proved the same points made in the physician declarations, and thus independently justify the denial of certification. *See*, *e.g.*, *KHS Corp.*, 2018 WL 4030699, at *5 (denying class certification based on deposition testimony of two employees regarding consent); *True Health*, 896 F.3d at 932 (similar, based on one declaration and one deposition by defendant representatives); *Biopay*, 541 F.3d at 329 (relying on defendant's

employee's testimony in upholding denial of class certification).

In sum, resolving the question of whether individual putative class members consented would require tens of thousands of cross-examinations of AMs and physician office employees. No such case could ever be tried on a classwide basis. Accordingly, the district court did not abuse its discretion in denying certification on the ground that Conner failed to prove common questions predominated over individual questions of consent.

### 2. Individualized Questions About Virtual Faxes Precluded Predominance.

Another reason the class cannot be certified is that individual questions predominate about whether putative class members received virtual faxes. The TCPA only prohibits sending faxes to "telephone facsimile machines," 47 U.S.C. § 227(b)(C), and the FCC has determined that "an online fax service" that "effectively receives faxes sent as email" is not a "telephone facsimile machine" under the TCPA. *In re Amerifactors Fin. Grp.*, 2019 WL 6712128, ¶ 3 (Dec. 9, 2019). Courts have applied the TCPA consistent with the FCC's position. *True Health Chiropractic v. McKesson Corp.*, 2020 WL 7664484 at *4 (N.D. Cal. 2020); *see also Katz Chiropractic v. Diamond Respiratory Care*, 340 F.R.D. 383, 389 (N.D. Cal. 2021) (citing *True Health*). Thus, class certification should be denied when there are individual questions about whether putative class members received the faxes on a virtual versus a traditional fax system. *Katz*, 340 F.R.D. at 389.

That is precisely the case here. Voluminous evidence from putative class members establishes that many of them did not use a traditional fax machine subject to the TCPA—they used e-faxes, which are like email. *See*, *e.g.*, APP01084 (Reda Decl. ¶ 4); APP01097-98 (Yealy Decl. ¶ 3); *see generally* APP00712-1183. And Openfax confirmed that it "has no way to know or determine whether the alleged recipients of any of the faxes in this matter received a transmission on a traditional fax machine as opposed to an internet-based 'virtual fax' (or e-fax) service." APP00711 (Kokinadis Decl. ¶ 6). The only way to answer this question is by taking individual discovery as to each putative class member.

The district court reached this exact conclusion after hearing live testimony from people who received e-faxes. *See* APP01756-57 (Tr. 1/24/23, 88:22-90:25) (office used "e-fax" and faxes "would come in electronically" so "we would see it [a fax] on the computer."); *see also* APP01783-84 (Tr. 1/25/23, 13:5-14:19) (office used efaxes that "open up like email" and that Fox's COVID-19 notices "came through efax."). That was not an abuse of discretion. And this Court may "affirm a district court for any reason supported by the record." *Malcomb*, 616 F. App'x at 45. Individual questions about virtual faxes are thus alone enough to affirm the denial of certification, as several courts have held. *True Health*, 2020 WL 7664484 at *4; *Daisy v. Mobile Mini*, 489 F. Supp 3d 1287, 1297 (M.D. Fla. 2021); *Katz*, 340

F.R.D. at 390.[3]

### 3. Individual Questions About Article III Standing Precluded Predominance.

Certification also should be denied because individualized issues of standing predominate. The Supreme Court recently held in *TransUnion LLC v. Ramirez* that all putative class members must have standing to recover. 141 S. Ct. 2190, 2214 (2021). "[A] statutory . . . cause of action does not relieve courts of their responsibility to independently decide whether a Conner has suffered a concrete harm under Article III." *Id.* at 2205. Conner must therefore be able to resolve standing on a class wide basis, or certification must be denied. *See e.g.*, *Cordoba v. DIRECTV*, 942 F.3d 1259, 1277 (11th Cir. 2019) (remanding case to determine whether standing could be resolved on classwide basis); *Cordoba v. DIRECTV,* 2020

---

[3]     For reasons Fox explained in the district Court, *Lyngaas v. Ag*, 992 F.3d 412, 427 (6th Cir. 2021) also helps Fox on this point, not Conner. APP01921-23 (Class Cert. Sur-reply). There, the Sixth Circuit addressed whether faxes "received by any device . . . that is not a traditional fax machine falls outside the scope of the TCPA." 992 F.3d at 427. Fox has not raised so broad an argument. The issue here, by contrast, is only whether there are individualized questions of liability because many potential class members received the notices over the internet as an email, which precisely what the FCC held *not* to be a "telephone facsimile machine" subject to the TCPA in *Amerifactors*, 2019 WL 6712128, ¶ 3. *Lyngaas* did not address *Amerifactors* because it was not briefed and would not have mattered on the facts. 992 F.3d at 427. But *Lyngaas* did reaffirm that an actionable claim requires the technology "on the receiving end [to] have the capacity to transcribe text or images (or both) from an electronic signal received over a telephone line onto paper." *Id.* Since there is evidence here that many recipients did not employ such technology, *Lyngaas* confirms that the virtual fax question precludes certification here.

WL 5548767, at *8 (N.D. Ga. July 23, 2020) (denying certification following remand).

Here, as noted above, individual inquiries are required to determine whether putative class members received any notices from Fox in the first place and, if so, whether they received them via traditional fax. Even if those questions were possible to resolve on a classwide basis, individual inquiries would be required to determine whether those who received the notices on a traditional fax machine suffered any concrete injury. Dozens of putative class member declarations confirm that such persons admittedly suffered no injury because they requested the notices and consented to receiving them. *See supra* Sections I.B., E. In fact, many putative class members attested that they—and their patients—*benefited* from the notices. *Id.* The only person who testified to the contrary in the three years this case has been pending is Conner. Since there is no classwide way to determine who else, if anyone, might claim to have suffered injury as a result of the faxes, denial of certification should be affirmed for this independent reason.

## C. The District Court Did Not Abuse Its Discretion in Finding that the Proposed Class Is Not Ascertainable.

Ascertainability is an "essential prerequisite to class certification." *Hayes v. Wal-Mart*, 725 F.3d 349, 354 (3d Cir. 2013). Ascertainability requires a showing that "(1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative

class members fall within the class." *Byrd*, 784 F.3d at 163 (quotations omitted). A class is not ascertainable "[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials.'" *Marcus*, 687 F.3d at 593; *see also Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013). Conner must establish that his proposed class is "currently" ascertainable, and assurances that the class will be precisely defined in the future are not sufficient. *Wachtel v. Guardian Life Ins. Co.*, 453 F.3d 179, 186 n. 2 (3d Cir. 2006); *see also Hydrogen Peroxide*, 552 F.3d at 318.

As the district court found, there was no reliable or administratively feasible way to determine which faxes were successfully transmitted by Openfax. *See supra* Section I.D. Openfax's President, Brett Kokinadis, attested that Openfax's transmission logs do not reliably indicate whether the faxes tied up the recipients' fax lines, such that they could not send or receive other faxes during the transmission of the faxes at issue here. *Id.*

Conner chides the district court for developing a "clearly erroneous understanding" of Mr. Kokinadis' declaration because the "mere occupation of the targeted fax number's line is a violation" of the TCPA, regardless of whether it precluded the recipient's machine from sending or receiving other faxes. Br. 46. But Conner did not raise this argument below and therefore waived it. *Diet Drugs*, 706 F.3d at 226; *see also* APP01202-03 (Class Cert. Reply) (failing to raise "mere

occupation" argument).[4]

Even if Conner had raised that argument below, it would not have helped him because the district court's understanding of Mr. Kokinadis' declaration was not an abuse of discretion. Conner's own cases show that Mr. Kokinadis' declaration supports the court's holding on ascertainability. *See Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.,* 781 F.3d 1245 (11th Cir. 2015) (finding successful transmissions where the plaintiff presented "*unrefuted* record evidence" that the faxes occupied the Conner's telephone line and fax machine and "*the transmission thereby rendered Palm Beach Golf's fax machine 'unavailable for legitimate business messages while processing . . . the junk fax'*") (emphasis added); *see also Imhoff Inc. v. Alfoccino, Inc.*, 712 F.2d 1034, 1036 (6th Cir. 2015) (quoting the TCPA's legislative history to show that in passing the TCPA Congress sought to prohibit "occupying the recipient's facsimile machine *so that it is unavailable for legitimate business messages while processing and printing the junk fax*") (quoting H.R. Rep. 102-317 at 10 (1991) (emphasis added).[5]

---

[4] Conner also never requested discovery on Mr. Kokinadis' declarations at the district court and thus waived that argument as well. *Diet Drugs*, 706 F.3d at 226; *see also* APP01202-03 (Class Cert. Reply) (failing to request any additional discovery into Kokinadis' declarations).

[5] In a similar context, circuit courts have held that there is no prerecorded voice TCPA violation if no prerecorded voice actually plays on a call. *Ybarra v. Dish Network, LLC*, 807 F.3d 635, 640 (5th Cir. 2015). Likewise, there is no fax TCPA violation if no fax lines were tied up or pages were printed.

*Kelly v. RealPage* cannot solve Conner's failure to prove ascertainability. 47 F.4th 202 (3d Cir. 2022). Conner concedes (Br. 24) that *Kelly* requires "a straightforward 'yes-or-no'" on class membership from existing records. That isn't possible here. Openfax's transmission logs are unreliable, as discussed above at Section I.D. Because a "successful" notation doesn't indicate whether a fax number received a notice, Conner wouldn't know what numbers on the Openfax transmission logs to cross-reference with Fox's records. Picking numbers on Openfax's logs thus wouldn't help ascertain the putative class members who actually received the notices.

Conner also accuses the district court of erroneously concluding there was no reliable way to link the fax numbers on Openfax's logs to actual doctors who may have received the faxes. Br. 50. But the method Conner now proposes to make that link—*i.e.*, using affidavits to prove ascertainability—was never presented to the district court. On the contrary, Conner's certification *reply* for the first time mentioned affidavits in passing in a case parenthetical, but never stated his methodology included affidavits. APP01201 (stating only "there are several ways to identify [fax] recipients, such as claims forms at the conclusion of the case"). Indeed, Conner's sole proposed method involved cross-referencing "Fox's records and those from Openfax." APP00610 (Class Cert. Mot.). When asked for specifics by the district court, Conner punted by vaguely responding that identification of

class members would "all get sorted out in the notice process." APP00035-36 (Tr. 8/1/22, 5:15-16, 6:3-4). Conner's own case shows that is not sufficient. *See Byrd*, 784 F.3d at 164 (party cannot "merely propose a method of ascertaining a class without" evidence showing that it works) (cleaned up).

In the cases Conner cites, putative class plaintiffs actually presented their proposed methodologies to the district court with supporting evidence, unlike here. *Kelly*, 47 F.4th at 224 (describing methodology); *Hargrove v. Sleepy's*, 974 F.3d 467, 479–80 (3d Cir. 2020) (same); *City Select v. BMW*, 867 F.3d 434, 437 (3d Cir. 2017) (same); *Byrd*, 784 F.3d at 169 (same). The district court thus correctly held that Conner's vague assurance was not sufficient. APP00104 (Order). And it is now far too late for Conner to propose a new method of class member identification that was never proposed to the district court. *Diet Drugs*, 706 F.3d at 226 ("It is axiomatic that arguments asserted for the first time on appeal are [] waived.").

## D. The District Court Did Not Abuse Its Discretion in Refusing to Compel Irrelevant Salesforce Records that Conner Did Not Request.

Having failed to justify reversal on the substance, Conner turns to procedure by arguing that the district court prematurely halted class certification discovery and erroneously denied Conner's motion to compel Fox's Salesforce records. Br. 3-5, 38 n. 7, 52 n. 8, 61. But that is not what happened.

Rather than denying Conner's motion outright, the court exercised its "broad

discretion to regulate discovery" and simply postponed ruling on the discovery issues until Conner filed its certification brief. *Superior Offshore Int'l, Inc. v. Bristow Grp., Inc.*, 490 F. App'x 492, 500 (3d Cir. 2012). In doing so, the district court followed Rule 23's and this Court's mandate that a class certification decision be made at "an early practicable time." *In re Citizens Bank, N.A.*, 15 F.4th 607, 618 n.9 (3d Cir. 2021) (explaining that "a certification decision must . . . not be unjustifiably delayed"). The district court similarly followed Rule 23's mandate that discovery should be "limited to those aspects relevant to making the certification decision on an informed basis." Fed. R. Civ. Proc. 23, 2003 Ad. Comm. Cmts. Indeed, when the court considered Conner's motion to indefinitely stay class certification briefing, the case had been pending for over a year, during which Fox had produced thousands of pages of putative class member records, the parties had taken six depositions, and the court had already extended the class certification deadline by 60 days. APP01992 (Opp'n to Mot. to Stay).

The district court nevertheless gave Conner two opportunities to explain what additional discovery he needed and why. First, at the hearing on Conner's discovery motions, Conner couldn't satisfactorily answer how the additional discovery was relevant to certification. *See supra* Section II.A. So, noting that Conner already had ten months of discovery, the court gave Conner two more weeks (on top of its previous 60-day extension) to file its certification motion *and to identify in its motion*

any discovery it believed it needed before the court decided the issue. *Id.* Conner identified only one item in passing: "the Court should [o]rder Fox to produce the Salesforce records" so that Conner could "have a more complete picture of the interactions between the [AMs]" and physician offices. *Id.*

The court was well within the bounds of its discretion in denying discovery of the Salesforce records—the only discovery identified in Conner's certification motion—for several independent reasons. First, Conner "never served any discovery request for the Salesforce data." APP00106 (Mem.). Conner falsely claims that he did, but his counsel conceded this issue long ago: "COURT: Is it correct that you **did not have any discovery requests that mentioned Salesforce** . . . ? MR OPPENHEIM: **Well, yes**." *Id.* (quoting ECF 54-52 at 18:10–16) (emphasis added). Nor were these records responsive to any of Conner's other discovery requests, as Fox explained to the district court. APP01927-28 (Class Cert. Sur-reply). The court's denial of this discovery thus was not an abuse of discretion. *Petrucelli v. Bohringer*, 46 F.3d 1298, 1311 (3d Cir. 1995) (serving discovery "prerequisite" to compel it).

In any event, the Salesforce records are immaterial to certification. Salesforce is *not* used to record anything about consent. *See supra* Section II.A. And contrary to Conner's repeated misrepresentation (Br. 5, 8, 35) that Fox "records every interaction" in Salesforce, the undisputed evidence is that the records are incomplete.

APP01868 (Blye Decl. ¶ 4) (explaining Fox only records a third of interactions); APP01156-57 (Dantona Decl. ¶ 13). Thus, just because there's no record of contact in Salesforce doesn't mean there was no contact.

Salesforce records are particularly irrelevant to consent because Fox continually obtained it from putative class members long before 2017, and Fox didn't even start using Salesforce until then. *See supra* Section II.A. Nor would Fox's incomplete Salesforce records alleviate Conner's burden to show individualized issues don't predominate. *See Hayes*, 725 F. 3d at 356 ("[T]he nature or thoroughness of a defendant's record keeping does not alter the plaintiff's burden to fulfill Rule 23's requirements. . . . Rule 23's requirements cannot be relaxed or adjusted on the basis of [the plaintiff's] assertion that [the defendant's] records are of no help to him.").

The other cases that on which Conner relies, *Hargrove* and *Kelly*, are inapposite. There, unlike there, both defendants were *required by statute* to maintain records relevant to the underlying merits and certification, which they failed to do. *Hargrove*, 974 F.3d at 483 ("[Defendant] had an obligation to keep clear employment records. It apparently failed to do so for the members of the proposed class"); *Kelly*, 47 F.4th at 219 (similar). Under those limited circumstances, the court declined to allow the defendants' failure to comply with their statutory recordkeeping obligations to defeat ascertainability. *Hargrove*, 974 F.3d at 483;

*Kelly*, 47 F.4th at 223.  Here, in contrast, no statute required Fox to maintain records of every instance that another healthcare provider consented to receive faxes in any of the myriad ways they could have done so—in writing, by phone, at a meeting, by providing their business card, and more.  *See supra* Section II.B.  Indeed, unlike in other sections of the TCPA, Fox is expressly *not* required to have "written" consent from class members.  *Cephalon*, 954 F.3d at 622 (affirming express consent existed where plaintiff "provided business cards with its fax number to drug company representatives, thereby giving express consent, invitation, and permission to receive related information[.]").

Salesforce records are also immaterial because Salesforce "had nothing to do with determining who would receive" the notices.  APP01522 (Blye Dep. 154:7–13).  For this reason, Conner's reliance on *City Select*, 867 F.3d at 441, is misplaced.  There, the plaintiff sought to compel the actual database from which the defendant pulled its list of intended fax recipients.  That is not Salesforce, which instead contains voluminous, irrelevant business data for hundreds of thousands of referral and non-referral sources that never received any of the notices at issue.  The district court thus did not abuse its discretion in refusing to compel the Salesforce records that Conner didn't request in discovery.

In fact, Conner's argument that it needs to review hundreds of thousands of individualized "interactions" confirms that the district court correctly held that no

class could be certified. Even assuming Salesforce records could fix Conner's consent problems—and they could not—there would still be numerous other issues barring certification as discussed above, including that the class is not ascertainable and individualized issues predominate on several dispositive issues other than consent. For these multiple, independent reasons, the Court should reject Conner's futile request for additional discovery.

### E.    The District Court Did Not Abuse Its Discretion in Refusing to Compel Discovery Requests that Conner Waived.

As discussed above at Section II.B., Salesforce records are the *only* item Conner raised in response to the district court's order to identify any further discovery Conner believed he needed in connection with certification. Conner nevertheless argues on appeal that the district court should have compelled other discovery, including records from Fox's Raintree database. Those are "waived arguments." *United States v. Dowdell*, 70 F.4th 134, 140 (3d Cir. 2023). Having taken the "position" that Salesforce records were the only additional records Conner claimed he needed, he "cannot on appeal assume a contrary position simply because" he now views "the decision" as "a tactical mistake." *Lesende*, 752 F.3d at 337.

In any event, Conner's belated complaint about not receiving discovery from Fox's Raintree database is a red herring. Raintree could not possibly have helped Conner to improve his deficient certification motion. As Conner concedes, Raintree is an "electronic record medical database" that records the names of doctors who

prescribe home therapy services to their patients. Br. 8-9. Thus, *some* of the doctors whose patients received therapy from Fox *might* be listed in Raintree, but there is no guarantee of that. *Id.* Moreover, given the passage of time, it is far from assured that physician contact information in Raintree, including fax numbers, is current or at all reliable. It is likely for that very reason that Conner's certification motion didn't request additional discovery on Raintree.

## II. Fox's Informational Faxes Were Not Advertisements, and Applying the TCPA to Punish Fox for Sending Them Would Violate the First Amendment.

Though the district court's class certification decision was correct, its ruling on the merits was not. Because it felt constrained by an incorrect interpretation of this Court's precedent on what constitutes an "advertisement," the district court reached the opposite conclusion on that issue from what every one of dozens of "reasonable recipients" testified: that the faxes were helpful informational notices, not ads. And because the court was reticent about the implications of holding otherwise, it sidestepped binding Supreme Court authority and held that applying the TCPA to Fox here did not violate the First Amendment. Both conclusions were erroneous.

### A. The TCPA Prohibits "Unsolicited Advertisements."

The TCPA makes it "unlawful" to send an "unsolicited advertisement" to "a telephone facsimile machine." 47 U.S.C. § 227(b)(1)(C). An "advertisement" is

"any material advertising the commercial availability or quality of any property, goods, or services." 47 U.S.C. § 227(a)(5). Conner bears the burden to prove that the faxes were "unsolicited advertisements." *Millennium*, 58 F.4th at 96.

This Court has exercised caution in applying the TCPA's definition of an "advertisement," warning that an expansive interpretation risks "extending too far the prohibitions that the TCPA established." *Optum*, 925 F.3d at 133. Thus, "not any and all faxes . . . sent for a commercial purpose" are advertisements, even those sent for the purpose of enhancing a company's reputation or bottom line. *Id*. (It is "beyond doubt that a fax does not become an advertisement merely because the sender intended it to enhance the quality of its products or services and thus its profits.").

Rather, a commercial fax becomes an "advertisement" only when it furthers the sender's profit motive by promoting the quality of a product or service in a way that is calculated to influence the purchasing decisions of a third party. *Id*. at 133; *Millennium*, 58 F.4th at 96. That determination is made under an "objective," "reasonable person" standard that is not dependent upon the subjective views of the fax's sender or Conner. *Id.*

**B.    The District Court Erred in Holding that the Faxes Were Advertisements.**

**1.    The District Court Applied an Incorrect Legal Standard.**

The district court's interpretation of *Millennium*'s "objective test" was that

"only that material contained within the four-corners of the fax" may be considered in determining whether a fax constitutes an advertisement. APP00128 (Mem.). This led the court to reach a conclusion contrary to what every reasonable recipient of the faxes testified: that the faxes here were not advertisements.

The district court's reading of *Millennium* was inconsistent with this Court's TCPA decisions and logic. Neither *Millennium* nor any of this Court's earlier TCPA decisions states, much less holds, that evidence outside the "four corners" of a fax should not be considered in deciding whether a fax is an advertisement. Nor is it true, as the district court stated, that *Millennium*'s "analysis started and ended with the four corners of the fax." APP00128 (Mem.). In *Millennium*, the defendant, which operated drug testing laboratories, faxed a flyer promoting a seminar about national trends in opioid use. 58 F.4th at 94. The plaintiff claimed the fax advertised Millennium's drug testing services and was a "pretext" for a later sales solicitation to be made at the seminar. *Id.* at 95. The district court granted summary judgment to Millennium, holding the fax was not an advertisement, but "considered only the fax itself" in making that determination. *Id.* This Court affirmed, based not only on the fax's contents, but also because Millennium's seminar was in fact free (a fact that the fax itself could not have confirmed) and did not in fact involve any product promotions or sales solicitations. *Id.* at 97. Thus, *Millennium* itself looked beyond the "four corners" of the faxes at issue.

Long before *Millennium* was decided, several district courts within this Circuit concluded it was entirely appropriate to look beyond the four corners of a fax to determine whether it was an advertisement. *See Physicians Healthsource, v. Janssen Pharm.*, 2015 WL 3827579, at *4 (D.N.J. June 19, 2015) (stating that "recent court decisions discussing the issue have come out against putting on 'evidentiary blinders in deciding whether a particular fax amounts to an advertisement.'"); *see also Cooper v. Medimetriks Pharm., Inc.*, 2020 WL 3542429, at *3 (D.N.J. June 30, 2020) (affirming magistrate judge's decision to require discovery before summary judgment motion practice in part because external evidence may be relevant to the issue of whether the faxes at issue constitute advertisements under the TCPA); *New Concept Dental v. Dental Res. Sys., Inc.*, 2020 WL 3303077, at *4 (S.D. Fla. March 17, 2020) ("Beyond its facial content, the context in which a fax is sent is also potentially relevant to a determination on its status as an 'advertisement.'").

It is well-recognized, and consistent with common sense, that a "reasonable person" must consider all relevant evidence, as the Supreme Court has held. *See, e.g.*, *Cnty. of L.A. v. Mendez*, 581 U.S. 420 (2017) (explaining that "objective reasonableness" requires "taking into account all relevant circumstances"). Contract law provides a particularly apt exemplar. Many states adhere to the "objective theory" of contracts, under which an agreement's construction should match what

would be understood by an objective, reasonable party. *See Iron Branch Assocs., LP v. Hartford Fire Ins. Co*., 559 F. Supp. 3d 368, 378 (D. Del. 2021) (applying Delaware law). That does not, of course, preclude a court from considering evidence outside the four corners of contract. On the contrary, the objective theory embraces consideration of "the commercial context between the parties" and their "basic business relationship," because any reasonable interpretation of a contract would require an understanding of both. *Id*. at 386 n. 92; *see also, e.g., Warren Hill, LLC v. SFR Equities, LLC*, 2019 WL 3304693, at *5 (E.D. Pa. July 23, 2019) ("We must always keep in mind the commercial context of the agreement" when interpreting unambiguous contractual language.) (collecting cases). By the same token, it makes no sense to say that a "reasonable recipient" of a fax would ignore all evidence of context, and myopically limit their review to the words on the page. The district court erred by holding otherwise.

### 2. By Refusing to Consider Evidence of Context, the District Court Erroneously Found the Faxes to Be Advertisements.

Had the district court considered all the relevant evidence instead of ignoring everything but the face of the faxes themselves, it would have concluded that the faxes were informational, not promotional, in nature. Indeed, every single "reasonable recipient" so testified, confirming the obvious error of ignoring context.

First, the district court ignored evidence that Fox sent the faxes in response to physician inquiries about whether Fox could safely see patients during the beginning

of the pandemic, when conditions were rapidly changing from week to week. As just one example, one office wrote to Fox on March 17, 2020, that "clinic and hospital based therapy for older people is being cancelled left and right due to the current situation with COVID-19," and inquired "is FOX restricting visits as well for safety reasons?" APP01853, 01857 (Hazel Decl. ¶ 4, Ex. A). Other offices made similar inquiries about whether Fox was open for business and how it planned to ensure patient safety. *See* APP01155, 1159-61 (Dantona Decl. ¶ 9, Ex. A) ("Are you still seeing patients?"); APP00754 (Spronz Dec. ¶ 8) (inquiring whether Fox "remained open and [about] patient safety during the pandemic."); APP01781 (Tr. 1/25/23, 8:4-18) ("[O]ne day to another you didn't know what business was going to close their doors [and] places were just being shuttered left and right and it was a lot of scrambling around, trying to find who's available to help us with our patients' special needs."). Patients were asking similar questions of Fox's referring physicians, a fact that was communicated to Fox. *See supra* Section I.D. Thus, Fox sent the notices to a relatively small group of doctors with whom Fox shared patients, because they would need to know that Fox remained open and what Fox was doing to ensure safety. APP01665, 1695 (Tr. 1/23/23, 105:4-11, 226:10-14, 227:4-15); APP01476 (Hazel Dep. 265:5-12).

That Fox sent the faxes in response to physician inquires to a small group of physicians with whom Fox shared patients—and not as unsolicited attempts to

promote its products for sale—strongly undercuts any reasonable notion that they were advertisements. That the faxes focused on the pandemic and were only sent during the short period that conditions were changing rapidly, instead of touting the quality, price, or value of Fox's ordinary-course services, further underscores their informational nature. The faxes use phrases that had no meaning before the pandemic, such as "flatten the curve" and "social distancing." Even the faxes' bullet points, which the district court found to "promote the commercial quality of the services offered," are aimed at Fox's "important role controlling the spread of COVID-19," as opposed to touting Fox's ability to achieve more traditional, pre-pandemic outcomes.

In reaching a contrary conclusion, the district court focused on alleged descriptions of the "quality of Fox's services" in the faxes, "even though these descriptions are within the context of dealing with the challenges of the pandemic." APP00130 (Mem.). Those descriptions, according to the court, showed "there is an embedded profit motive to gain referrals from past providers . . . ." *Id.* But even if Fox had an "embedded profit motive," that is not enough to qualify the fax as an advertisement. *Optum*, 925 F.3d at 133. The same is true of language "merely declaring the availability of a good or service." *Mauthe*, 2018 WL 3609012, at *6 (E.D. Pa. July 27, 2018), *aff'd*, 925 F.3d 129 (3d Cir. 2019). Indeed, faxes providing information "so doctors could make informed prescribing decisions" for their

patients, exactly as here, are not advertisements. *BPP v. CaremarkPCS Health, LLC*, 2021 WL 5195785, at *2 (E.D. Mo. Nov. 9, 2021), *aff'd*, 53 F.4th 1109 (8th Cir. 2022) (affirming summary judgment on this basis).

The district court further erred in refusing to consider the testimony of fax recipients who, with full knowledge of the same context the court ignored, did not regard the faxes as advertisements. Dozens of physician offices testified the notices were "very important" and "helpful" within the context of the pandemic because providers needed to know which home health companies were continuing to provide services and how they were planning to do so safely. Of the 30 to 50 fax recipients Fox spoke with, *not a single one* said they "thought the faxes were trying to sell them something." APP01739 (Tr. 1/24/23, 20:4-9). The same was true of office representatives who testified at trial. *See supra* Section I.E.

The *only* testimony Conner presented stating otherwise was Conner's subjective "feel[ing]" that "it was bullshit" that the faxes were "informational and helpful." APP01654 (Tr. 1/23/23, 62:3-6). But under *Millennium*, the self-serving, tautological testimony of a serial TCPA plaintiff is not at all probative of how a *reasonable* recipient would have viewed the faxes. 58 F.4th at 96.

### C. The TCPA's Commercial Fax Ban Violates the First Amendment.

The district court's decision that Fox is liable for faxing medically helpful information related to the COVID-19 pandemic also illustrates why the TCPA's ban

on commercial faxes violates the First Amendment. The Court should avoid these constitutional issues by simply reversing on the ground that the faxes were not advertisements. Otherwise, binding Supreme Court authority requires that this Court reverse the district court's decision as a violation of the First Amendment.

"Above all else," the First Amendment means that government generally has no power to restrict expression "because of its message, its ideas, its subject matter, or its content." *Barr v. Am. Assoc. of Pol. Cons., Inc. ("AAPC")*, 140 S. Ct. 2335, 2346 (2020) (quotation marks omitted). "When enforcing this prohibition," courts therefore must "distinguish between content-based and content-neutral regulations." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992)). "Content-based laws are subject to strict scrutiny," without exception. *AAPC*, 140 S. Ct. at 2346. As the Supreme Court recently reiterated in a case involving a different section of the TCPA, "[c]ontent-based laws are subject to strict scrutiny," without exception, even when the law targets commercial speech. *Id.* at 2346; *see also Sorrell*, 564 U.S. at 566 ("Commercial speech is no exception.").

The TCPA's fax ban is undeniably a content-based law.  It does not ban all unsolicited faxes, or even all unsolicited commercial faxes, but only those that convey content that "advertis[es] the commercial availability or quality of any property, goods, or services."  47 U.S.C. § 227(a)(5).  Under this definition, the fax at issue in *Millennium*, for example, was not an "advertisement" under the TCPA merely because it promoted a seminar that was free to attend, even though the fax was commercial and its ultimate purpose was to enhance Millennium's bottom line.  58 F.4th at 96.  Had Millennium charged even a penny for attendance however, the result would have been different and the fax would have violated the TCPA.  This sort of content-based discrimination applies no matter how socially important or worthwhile the message conveyed by a fax.  For example, a fax sent by a local hotel to a shelter advising that it remains open and available to help house (for a discounted price) people displaced by fire would violate the fax ban.  If the hotel faxed a notice that its rooms were available for free however, there would be no violation, even though the core of each message – that the hotel was available at a time of need – was the same.  That remains true if the hotel only advertised free rooms to, for example, members of the Neo-Nazi party.

On the other side, the TCPA does not ban *any* non-commercial faxes, no matter how outlandish or socially repulsive their content may be.  A fax spanning hundreds of pages detailing the intricacies and conspiracies of the Sovereign Citizen

movement or QAnon would be permissible. So would a fax asking individuals to join their fringe political or religious group. Indeed, the TCPA permits a potentially infinite variety of unsolicited faxes to be sent in full compliance with the statute, regardless of what they advertise, so long as they do not promote the sale of a good or service. As Justice Kavanaugh put it, "[t]hat is about as content-based as it gets." *AAPC*, 140 S. Ct. at 2346 (plurality opinion).

Accordingly, to the extent this Court affirms the district court's ruling that the faxes were advertisements subject to the fax ban, strict scrutiny applies, which the fax ban fails.[6]

### D. The Fax Ban Fails Strict Scrutiny.

Because strict scrutiny applies, the TCPA fax ban is invalid unless it "furthers

---

[6] In addition to being subject to strict scrutiny because it is content based, there are several other reasons why a lower level of scrutiny could not apply to the fax ban. First, while commercial speech may be relaxed "to protect consumers from misleading, deceptive, or aggressive sales practices, or require[ing] the disclosure of beneficial consumer information," the TCPA's fax ban does not seek to protect anyone from being misled or deceived. *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) (plurality opinion). Second, commercial speech subject to a lower level of scrutiny is "speech which does no more than propose a commercial transaction." *Va. St. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) (quotation marks omitted); *accord United States v. United Foods, Inc*., 533 U.S. 405, 409 (2001). The notices Fox sent are thus not commercial speech under the First Amendment because they certainly did not "do[] no more than propose a commercial transaction," as both the district court and dozens of witnesses agreed. *See supra* Sections I.B., E., II.D. Instead, they provided critical information about the COVID-19 emergency that helped referring physicians and their patients. *Id.*

a compelling interest and is narrowly tailored to achieve that interest." *Ariz. Free Enter. v. Bennett*, 564 U.S. 721, 734 (2011). "[I]t is the rare case" that "a law survives scrutiny." *Burson v. Freeman*, 504 U.S. 191, 211 (1992) (plurality). This case is not one of them.

### 1. The Fax Ban Does Not Further a Compelling Interest.

Compelling interests are "'interests of the highest order'" and "'vital state interests.'" *Willey v. Harris Cnty. Dist. Att'y*, 27 F.4th 1125, 1131 (5th Cir. 2022) (quoting *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 447 (2015)). They include such interests as "combating terrorism, protecting election integrity, [and] remedying the effects of past unconstitutional race discrimination." *Willey*, 27 F.4th at 1131.

The TCPA fax ban does not further a compelling interest of the highest order. Congress's purpose with the fax ban was only to save fax machine owners from the cost and annoyance of receiving unsolicited faxes. *See* H.R. Rep. No. 102-317 at 10, 25 (1991); *Destination Ventures v. FCC*, 46 F.3d 54, 56 (9th Cir. 1995); *Cmty. Vocational Sch. v. Mildon Bus Lines*, 307 F. Supp. 3d 402, 414 (W.D. Pa. 2018). No court has ever found this to be a compelling interest, and for good reason. Reducing minor annoyances does not rank with compelling interests, such as combatting terrorism.

### 2. The Fax Ban Is Not Narrowly Tailored.

"If a statute regulates speech based on its content, it must be narrowly tailored

to promote a compelling Government interest." *United States v. Playboy Ent. Grp. Inc.*, 529 U.S. 803, 813 (2000). The TCPA's fax ban fails that test too, independently confirming that it violates the First Amendment.

A content-based regulation of speech must "satisfactorily accomplish[] its stated purpose" to survive strict scrutiny. *The Fla. Star v. B.J.F.,* 491 U.S. 524, 541 (1989). A regulation that is "underinclusive[]"—one that does too little to advance the interests invoked—"raises serious doubts about whether [the government] is, in fact, serving" the interests asserted. *Id*. at 540. After all, "[a] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *Republican Party v. White*, 536 U.S. 765, 780 (2002) (quotation omitted).

That is the case here. The TCPA permits "appreciable damage" to the supposed interest the fax ban is supposed to serve. A fax "advertisement" is no more costly to a recipient than any other unsolicited fax—they all use the same paper and ink and may cause annoyance. The TCPA nevertheless permits any other unsolicited faxes, including those that promote political candidates, provide information about the weather, or even "advertise" free seminars that seek to promote companies and their products. But sending a single one-page fax confirming that patients could still get home care during the pandemic would violate the TCPA and subject the sender

to tens of millions in strict liability damages at up to $1,500 per fax. That significantly "diminish[es]" the "rationale for restricting speech" and confirms the fax ban is not narrowly tailored. *Ladue v. Gilleo*, 512 U.S. 43, 52–53 (1994).

Second, the fax ban is not narrowly tailored because less restrictive alternatives are available to achieve the stated interest. "When a plausible, less restrictive alternative is offered to a content-based restriction, it is" unconstitutional unless "the alternative will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816.

It could never be shown here that alternatives to a content-based fax ban would be ineffective. There are myriad content-neutral ways to reduce the cost and minor annoyance of receiving faxes. Congress could have simply banned *all* unsolicited faxes, regardless of content. Or it could have adopted a "do not fax" list that consumers could place their fax numbers on if they don't want to receive faxes of certain types, similar to the national Do Not Call Registry for telephone numbers. *See* 47 C.F.R. § 64.1200(c)(2). Or it could have restricted advertisers from sending faxes during peak hours or restricted the number of unsolicited faxes advertisers can send. These less restrictive alternatives doom the ban.

## E. Even if Intermediate Scrutiny Applies, the Fax Ban Would Not Pass Constitutional Muster.

Even if intermediate scrutiny applied (it does not), the fax ban would nonetheless fail because the fax ban is: (1) unsupported by a "substantial"

government interest; (2) fails to "directly and materially advance[]" that interest; and (3) is not "no more extensive than necessary" to serve the government's interest. *Ibanez v. Fla. Dep't of Bus. & Prof. Reg.*, 512 U.S. 136, 142-43 (1994) (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980)).

Here, the ban fails all three requirements.  First, the government's interest in preventing fax recipients from bearing the costs of receiving unsolicited advertising faxes (*see* H.R. Rep. No. 102-317 at 10, 25 (1991)) is not a "substantial" interest for all the reasons discussed above.  *Cf. Craig v. Boren*, 429 U.S. 190, 199 (1976) ("[T]he protection of public health and safety" is a substantial, important interest.).

Second, even if the government had a substantial interest, the fax ban does not "materially advance" that interest since the TCPA bans only faxes that promote goods or services for sale, excepting all other forms of unsolicited faxes to consume paper, ink, phone line capacity and so on.  *See AAPC*, 140 S. Ct. at 2357 (explaining that the TCPA's content based robocall restriction failed intermediate scrutiny because it permitted "many of the intrusive calls" that the "ban was enacted to prohibit") (Sotomayor, J., concurring).

Third, the fax ban is not sufficiently tailored to the government's asserted interest.  The differential treatment of commercial and non-commercial faxes (and amongst different types of commercial speech) "bears no relationship whatsoever to the particular interests that the [government] has asserted" as a fax imposes the same

costs on a recipient regardless of content.  *Millennium*, 58 F.4th at 96.

Moreover, the fax ban is not sufficiently tailored because it bans speech when there are numerous other means of reducing the costs of unsolicited faxes to fax recipients, including a wide range of less restrictive alternatives, as discussed above. *See Thompson v. W. States Med. Ctr.,* 535 U.S. 357, 371 (2002) (The "Government must" achieve its interests "in a manner" that "restricts less speech," if possible). The fax ban thus fails intermediate scrutiny.

***

In sum, the TCPA's fax ban violates the First Amendment.  The Court should avoid those constitutional problems by adopting the "narrow[er] reading" of the TCPA's fax ban that does not sweep in the faxes at issue.  *Id.*  As this Court held in *Yung*, it "must adopt" a "textually plausible" interpretation that avoids constitutional concerns.  *Id.* at 79; *see also Brown v. City of Pittsburgh*, 586 F.3d 263, 286 (3d Cir. 2009) (applying constitutional avoidance in First Amendment context).  Narrowly interpreting the TCPA's definition of "advertisement" to exclude the informational notices Fox sent about the COVID-19 crisis is not just "plausible," but consistent with the great weight of authority and evidence, as explained above.  Were the Court to hold otherwise, the TCPA fax ban would not pass First Amendment scrutiny.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should affirm the district court's order

denying class certification and reverse the denial of Fox's motion for summary judgment, as well as the judgment at trial holding that the faxes at issue were advertisements that violated the TCPA.

Dated: October 3, 2023

By: */s/ Ryan D. Watstein*
Ryan D. Watstein
Alexander D. Terepka (*admission* forthcoming)
Abigail L. Howd (*admission* forthcoming)
**WATSTEIN TEREPKA LLP**
1055 Howell Mill Road, 8th Floor
Atlanta, Georgia 30318
Tel.: (404) 418-8307
ryan@wtlaw.com
alex@wtlaw.com
ahowd@wtlaw.com

*Counsel for Appellee-Defendant/Cross-Appellant Fox Rehabilitation Services, P.C.*

## CERTIFICATION OF COMPLIANCE AND SERVICE

I hereby certify that:

1.     I am a member of the bar of this Court;

2.     This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(B) because it contains 16,452 words, as counted by Microsoft Word, the word processing software used to prepare this brief;

3.     This brief also complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been set in a 14-point, proportionally spaced typeface (Times New Roman);

4.     The text of the electronic file of this brief is identical to the text of the paper copies of this brief;

5.     Prior to filing, the electronic file of this brief was scanned using the virus scanning software named Malwarebytes, Version 1.7.0.138, and no virus was detected; and

6.     All parties of record are Filing Users and, as required by 3d Cir. L.A.R. 113.4, this brief and appendix has been served electronically by the Notice of Docket Activity generated by the Third Circuit's electronic filing system.


Dated: October 3, 2023          By: */s/ Ryan D. Watstein*

                                        Ryan D. Watstein

                                        *Counsel for Appellee-Defendant/Cross-Appellant Fox Rehabilitation Services, P.C.*